# Illinois Official Reports

## Appellate Court

*In re Estate of McHenry*, 2016 IL App (3d) 140913

| | |
|---|---|
| Appellate Court Caption | *In re* ESTATE OF CHASE McHENRY, an Alleged Disabled Adult, Respondent (Laurie McHenry, Petitioner-Appellee, v. Daniel Shayne McHenry, Cross-Petitioner and Appellant). |
| District & No. | Third District<br>Docket No. |
| Filed | August 26, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Peoria County, No. 13-P-253; the Hon. Scott Shore, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Christopher P. Ryan, of Peoria, for appellant.<br><br>Susan Dawson-Tibbits (argued), of Johnson, Bunce & Noble, P.C., of Peoria, for appellee. |
| Panel | JUSTICE CARTER delivered the judgment of the court, with opinion.<br>Justice Holdridge concurred in the judgment and opinion.<br>Justice Schmidt specially concurred in the judgment, with opinion. |

**OPINION**

¶ 1        Petitioner, Laurie McHenry (Mother), filed a petition under the Probate Act of 1975 (755 ILCS 5/1-1 *et seq.* (West 2012)) to be named the plenary guardian of the person and estate of her disabled adult son, Chase McHenry. Chase's father, cross-petitioner Daniel McHenry (Father), filed a competing petition to be named Chase's guardian. After a bench trial, the trial court granted Mother's petition and named Mother Chase's sole plenary guardian. Father appeals, arguing that (1) the trial court erred in naming Mother as Chase's guardian, rather than Father; (2) the trial court's ruling should be reversed because of an undisclosed judicial bias; and (3) the trial court erred in initially setting support to be paid by Father at 20% of Father's income. We affirm the trial court's judgment.

¶ 2                                                    FACTS

¶ 3        Mother and Father were married in 1990 and lived in Florida. They had two children: Kaitlin, born in 1994, and Chase, born in 1995. Mother and Father separated in 1997, and Mother and the two children moved to Peoria, Illinois, where Mother's family was located. Father remained in Florida. Shortly after Mother moved to Illinois, it was determined that Chase had autism. Mother and Father's divorce was finalized in 2001, and the parties entered into a joint parenting agreement, which gave Mother custody of the children and Father visitation.

¶ 4        In June 2013, as Chase was approaching the start of his senior year of high school, Mother filed the instant petition to be appointed the plenary guardian of Chase's person and estate. The petition alleged that Chase was a disabled person because of his autism and that he lacked sufficient understanding or capacity to make or communicate responsible decisions regarding the care of his person and the management of his estate and financial affairs. A guardian *ad litem* (GAL) was appointed to represent Chase's interests during the proceedings.

¶ 5        In October 2013, Father filed a cross-petition for guardianship.[1] In the cross-petition, Father agreed that Chase was in need of a guardian and that Mother was qualified to serve in that capacity. Father asked, however, in Chase's best interest, to be appointed coguardian so that he could participate in decisions as to Chase's education, residential placement, and financial assets.

¶ 6        In November 2013, an agreed order was entered appointing Mother and Father as temporary coguardians of Chase. The order also gave Mother and Father time to obtain neuropsychological evaluations of Chase and to investigate the post-high school options that were available to Chase in both Florida and Illinois. In addition, Chase was appointed his own attorney because the GAL had taken a position that was contrary to Chase's wishes.

¶ 7        At various points in this case, the parties filed their financial affidavits. Father's financial affidavit indicated that he was 53 years old; that he owned his owned consulting business;

---

[1]Father's pleading was titled as a petition for appointment of coguardian. However, by the time of the bench trial in this case, it was clear that the parties could not serve as coguardians and that Father was seeking to be appointed as Chase's sole plenary guardian. To avoid confusion, we have referred to Father's petition here as a cross-petition for guardianship.

that his gross income was approximately $150,000 a year ($12,500 a month); that his monthly expenses were approximately $16,527; that his current spouse contributed a minimum of $2000 a month toward expenses; that he had been paying $1700 a month in child support until May 2014 when child support allegedly ended; that after May 2014, he had been voluntarily paying $500 per month in temporary child support; and that he had approximately $500,550 in total assets and $76,400 in total debts. Mother's financial affidavit, which was later amended, indicated that she was 53 years old; that she worked as a certified occupational therapy assistant; that her gross income was approximately $26,124 a year ($2177 a month); that she had been receiving $500 a month from Father in child support; that her monthly expenses were approximately $5031; and that she had $21,500 in total assets and $13,785 in total debts, a large portion of which were legal fees.

¶ 8    A bench trial was held on the guardianship petitions in September and October 2014. Going into the trial, the parties were in agreement that Chase was a disabled adult, that he was in need of a guardian, and that appointing Mother and Father as Chase's coguardians was not a workable solution. The trial court, therefore, was called upon to determine, in Chase's best interest, which one of the two parents should serve as Chase's guardian—Mother or Father. That decision would ultimately also determine, in practical effect, whether Chase was going to remain in Illinois or was going to be required to move to Florida.

¶ 9    The evidence presented at the trial, although not necessarily in the order presented, can be summarized as follows. Mother testified that she lived in Peoria and had worked for the past seven years in the local public schools as a certified occupational therapy assistant. When Mother and Father separated in 1997, Chase was only about two years old and had not yet been diagnosed with autism. About midway through the year, however, Mother started to notice that Chase was not reaching the developmental milestones and that he had some potential impairment. Mother discussed the matter with the children's pediatrician, Dr. Thomas Halperin, and was referred to a developmental pediatrician, Dr. Andrew Morgan, for Chase to be evaluated. Mother informed Father of her concerns, and Father wanted Chase to be evaluated as well. There was a three-month wait time for the appointment with Dr. Morgan. During that time period, Mother enrolled Chase in an early intervention preschool through Easter Seals and also started Chase in speech and occupational therapy.

¶ 10    Mother and Father attended Chase's evaluation together. At the conclusion of the evaluation, Dr. Morgan diagnosed Chase as having pervasive development disorder not otherwise specified (an autism spectrum disorder) and possible mental retardation. Chase had no communication skills at the time, had no eye contact or language, and would throw a temper tantrum because he had no way to express what he wanted or to understand what was going on. After the diagnosis, Mother began to research Chase's condition by reading books and other materials; attending seminars; attending Chase's speech and occupational therapy sessions; and by talking to other parents, speech pathologists, occupational therapists, and anyone else who would talk to her about Chase's condition. According to Mother, since the day that Chase was diagnosed, she made it her mission to educate herself about Chase's condition and about what could be done so that she could help Chase grow and be as independent as possible.

¶ 11    Mother later arranged for Chase to be evaluated in Maryland by Dr. Stanley Greenspan, a world-renowned specialist on developmental disorders. After the evaluation, Dr. Greenspan

also concluded that Chase was on the autism spectrum. Dr. Greenspan recommended that Mother be very hands-on in interacting with Chase and in getting Chase to make eye contact.

¶ 12 Early on, through her research, Mother came to believe that Chase was having seizures. Mother addressed that concern with Dr. Morgan and was told that seizures were very rare in children with autism. Mother persisted in her efforts and, on her own, found a pediatric neurologist in Illinois, Dr. Michael Chez, who specialized in autistic pervasive developmental disorders and epilepsy. After conducting tests, Dr. Chez confirmed that Chase was, in fact, having seizures. Father did not attend the initial testing with Dr. Chez and, as far as Mother knew, never contacted Dr. Chez about his findings. Father did, however, attend one of Chase's later monitoring visits with Dr. Chez. Pursuant to Dr. Chez's recommendation, Chase was started on a daily seizure medication. The results were dramatic. Within the first week, Chase started making eye contact, getting language, and sleeping through the night. Eventually, the seizures went away completely, and Chase was weaned off of the seizure medication.

¶ 13 When Chase turned three, he transitioned from the Easter Seals early intervention preschool program to the local public school's special education early childhood program. Chase was in the early childhood program for three years until he was six years old. While Chase was in the early childhood program, Mother advocated for Chase to have a one-on-one aide, but the school district did not have such a person. Chase's teacher filled out a form of all of the duties that an aide would perform for Chase, and Mother called Easter Seals to find out if they had a student or anyone else that really stood out as a volunteer. Easter Seals recommended a person, and Mother and Chase's teacher interviewed that person together. That person got hired by the school district as Chase's one-on-one aide and was paid for by the district.

¶ 14 Mother had started an Applied Behavior Analysis (ABA) program by that point, and she asked the student if she was interested in working at home with Chase. The student stated that she was. Mother trained that student, and then that student recruited other students. The students would fill out an application, and Mother would hire those students to work in her home with Chase. The students were paid for their work through the Department of Human Services (DHS) because Chase qualified for funding since his skill level was so low due to his disability. Mother felt that additional home training was important for Chase because Chase had no skills and, for a long time, had no language. He was very behind in academics, had major behavioral issues, and would have meltdowns and would bang his head on the floor, throw himself into the wall, roll around, kick, and scream. Chase would also perseverate on things and would lie down on the ground and kick and scream if he could not get what he wanted. Those issues were what led Mother to implement the ABA program at home.

¶ 15 The second year that Chase was in the special education program, Mother requested that he be allowed to spend a portion of the day in the regular division preschool with his typically developing peers. Mother's request was granted, and every day Chase would take his aide and go to the regular division classroom for a brief period. Mother thought it was important for Chase to do so because he needed to learn language and social skills from the typically developing children. Father was not involved in any way in advocating for or obtaining the one-on-one aide for Chase at school, in having an aide work with Chase at home, or in obtaining the funding for the in-home aide. According to Mother, although

Father never objected to those things, he never dug in and helped with any of those things either.

¶ 16    In 2003, when Chase was six years old, he entered kindergarten. When he did so, the school district wanted to put Chase in a special education classroom, instead of a regular division classroom. After researching the matter, Mother objected. Mother wanted Chase in a regular division classroom to see if it was appropriate for him and because it would be much easier to transition Chase from a regular division classroom to a special education classroom, if that was necessary, rather than the other way around. As a result of Mother's efforts, Chase was placed into regular division classes throughout grade school and was only pulled out of those classes by the special education teachers from time to time to work on his major areas of deficit.

¶ 17    Around the time when Chase entered kindergarten, Mother went back to school to obtain an associate's degree in occupational therapy. Mother chose occupational therapy because she was interested in that area and because she needed a schedule that would match Chase's school schedule because there was no appropriate after-school care for Chase. Mother obtained her associate's degree and started working at the local schools in 2008.

¶ 18    As noted above, the behavior program that Mother decided to implement at home was the ABA program. The ABA program focused on changing a child's behavior in a very positive manner. In the program, everything was broken down into very simple steps for children who were on the autism spectrum. As Chase got a little older, Mother did other things as well to help Chase participate in class. For example, Chase did not know that he was supposed to raise his hand if the teacher asked a question and he knew the answer. Mother and her students, therefore, set up a pretend classroom in Mother's basement and would play school. A student would pretend that he or she was the teacher, and Mother would sit behind Chase. When the student asked a question, Mother would prompt Chase to raise his hand if he knew the answer.

¶ 19    As a result of Mother's efforts, by the time that Chase entered kindergarten, he was able to sit at a table and be attentive to the teacher for a very short period of time. Mother wanted to educate the school on what she was doing at home with Chase (the ABA program), why she was doing it, and why she thought it would help for the school to carry that over into kindergarten and grade school. Mother provided the school with citations to research that had been done on the ABA program so that the school could see that the program had been successful. Mother also provided the school with a list of what she expected from the school and a biography about Chase that she had written so that the school would know as much as possible about Chase, his disability, and about the things that would set him off and cause tantrums. Mother and Chase's aide also put together a list of helpful information for Chase's teacher. In addition, Mother provided Chase's teacher with a notebook for helpful hints—things that the teacher found worked and did not work. That notebook was passed along each year to Chase's new teacher. Mother also went into the classroom and educated the other students about Chase and his disability, so that the other students had a better understanding of Chase and were more likely to accept him.

¶ 20    Early on in middle school, Chase took some of his courses in special education and some in regular division. However, as the class work became more difficult, Chase's lack of reading comprehension became more of a problem. Mother went to the school and successfully advocated for Chase to be placed in more special education classes because she

felt that he needed more support to be able to do the class work. At a later conference, the special education teacher told Mother that although she did not agree with Mother initially, Mother was right, and Chase was now producing his own work. By the time Chase was in high school, most of his classes were in special education. The only high school classes that he did not take in special education were lunch, physical education, health, and his freshman and sophomore algebra class.

¶ 21    Chase had an Individualized Education Plan (IEP) starting from when he was in the early childhood program up until the time he graduated from high school. Mother was involved in every IEP conference without exception. Mother called other conferences with the school as well when she wanted to address particular matters with them. Father attended the IEP conference when Chase was being transitioned into kindergarten. The next IEP conference that Father attended was when Chase was a freshman in high school. According to Mother, at the IEP conferences in high school, Father's main focus was on Chase going to college.

¶ 22    At Richwoods High School, where Chase attended, there were specific programs offered to help Chase transition to life beyond high school. One such program was the Secondary Transition Education Program (STEP). Chase was enrolled in STEP in 2011, his sophomore year. In that program, Chase worked with Kurt Mankle (the school's work coordinator) and Leigh Bowen (the transition coordinator between the school district and the DHS). Through STEP, Chase obtained work experience, attended work skills classes, and received job-related information. As part of his work experience, Chase worked as a volunteer in the school cafeteria, in the school library, and in the local public library.

¶ 23    Chase started working as a volunteer in the local public library in January 2014 during his senior year of high school. Mother had essentially created that position for Chase by going in and talking to the library manager. Chase's job responsibilities at the public library were to alphabetize and shelve books. According to Mother, it was a successful placement in that Chase did an excellent job alphabetizing and shelving and was very polite, but it was unsuccessful in that when patrons came up and asked Chase questions, he could not direct them, even though he had been instructed to send them to the information desk.

¶ 24    Mr. Mankle later found Chase a job at Courtyard Estates, where Mankle had other students working. Chase started at Courtyard Estates in April 2014. Chase's job responsibilities at Courtyard Estates were to take the residents' requests for food and drinks; to fill those requests; to clean the tables after the residents were finished eating; to sweep, mop, and change the trash; to fill the condiments; and to roll silverware into napkins in preparation for the next meal time. Chase did not have any problem with the communication aspects of the job. On average, Chase worked at Courtyard Estates four evenings a week for three hours each evening. Chase enjoyed his job at Courtyard Estates. The residents and other staff members really liked him and were very supportive. Chase was not currently receiving any ongoing job coaching or job support services but did receive some job coaching during his first week on the job. The job coach wrote down everything for Chase, and Chase and Mother went over the list each night so that Chase would know what his responsibilities were.

¶ 25    Some of the skills that Mother had worked on with Chase over the years, other than academics, included: sorting and putting away his laundry, making simple meals in the microwave, making his own pitcher of lemonade, using the toaster, taking out the trash, emptying the dishwasher, setting the table, dusting, taking the city bus to and from work (the

city bus had a door-to-door service for disabled adults), and locking the door when he left for work. To introduce a new skill to Chase, Mother would break it down into steps, write the steps down, and then practice the steps with Chase. Mother was currently teaching Chase how to use the washing machine, how to do some basic banking functions, and how to use a list to get groceries.

¶ 26    With regard to Chase's social development, Mother stated Chase had some friends through school, but it was difficult for him. Chase's one-on-one aide specifically worked on social skills with him at school during physical education class and recess. The speech pathologist worked on those skills with Chase as well. When Chase was younger, he went to birthday parties, took Jazzercise, and went to Sunday school and church. As he got older, he participated in some of the junior high programs where there were a lot of kids involved. When Chase was in high school, he was involved in the Friendship Club, went to basketball games, and would watch his sister swim. Currently, Chase liked to bowl, roller skate, exercise, shoot baskets, read, watch movies, do word search puzzles, collect books, go to the library, visit other libraries, look at maps, have Mother drive him around and find out where streets went, play bingo, and participate in activities through the Heart of Illinois Special Recreation Association (HISRA). HISRA provided recreational activities for children and young adults with disabilities. Whenever Mother got the new HISRA catalog, she and Chase would sit down and go through it, and Chase would pick out some activities that he wanted to do. HISRA also had a program called "Focus," which worked on social skills, life skills, and other things. Chase could attend the Focus program anywhere from one to four days a week from 9 a.m. to 3 p.m. each day.

¶ 27    According to Mother, at the time that Chase was diagnosed, there were not a lot of services in central Illinois for children with autism spectrum disorders or for their parents. Mother helped start a support and advocacy group and learned how to write grants to support the activities of the group. The group pushed for services in the area and was successful in doing so. In addition, with the funds that were raised, the group held conferences and brought in experts to speak and to consult with the schools about the services that were being provided. Mother had attended, or her group had hosted, conferences on autism in 1998, 1999, 2005, and 2010.

¶ 28    When asked about whether she had a transition plan for Chase, Mother responded that she had been living the transition plan—she had consulted doctors, had consultants come into the school, had educated herself—and that everything she had done and every decision she had made, had been to promote Chase's independence. According to Mother, promoting Chase's independence was the reason why Chase had taken the classes he had taken, was why Chase had been in speech and occupational therapy, was why Chase had been in the work-training program, and was why Mother had enrolled Chase on the Prioritization of Urgency of Need for Services (PUNS) list, the State's waiting list for services. Mother gave a similar response when she was asked why she believed it was in Chase's best interest for her to be Chase's guardian.

¶ 29    Mother stated further that she had printed a transition toolkit off of an autism website a few weeks ago and was going through it and had realized that she had essentially done all of the steps that were listed. A copy of the transition toolkit was admitted into evidence at the trial. The toolkit was divided into sections. Each section pertained to a particular topic area that parents were supposed to consider as they were preparing to transition their child from

high school to adulthood. Mother went through each section of the toolkit during her testimony and described what she had done in relation to that particular topic area.

¶ 30    Starting with the first section, self-advocacy, Mother stated that she believed that Chase needed to be part of the process and that his thoughts and desires needed to be taken into consideration. According to Mother, she started teaching self-advocacy to Chase early on in her ABA program when she taught him how to raise his hand in the classroom. They also worked on self-advocacy a lot at school for Chase to be able to advocate for himself and to say what his needs, desires, and wants were and if he needed help.

¶ 31    Section two of the toolkit addressed community living. In her discussion of that section, Mother described how Chase had been successful in riding the city bus to and from work, although he still did not have the skills or capacity to be able solve any problems that arose with the bus. As for safety under community living, Mother stated that from the time that Chase was very young, she had been working with him on such skills as knowing his name, address, and phone number in case he ever got lost; identifying strangers; identifying community members who could offer assistance; knowing how to use a cell phone; and other things of that nature. Mother filled out a chart that showed Chase's community life, social activities, and resources, such as the HISRA and Focus activities. Chase had to wait until the past August, when he turned 19, to participate in some of those activities. Chase had selected some of the programs that he wanted to participate in and was registered for those programs. Another activity that Chase was involved in was the Antioch Group, a weekly interpersonal effectiveness peer group that was specifically tailored for young men who had some form of pervasive developmental disorder.

¶ 32    Section three of the transition toolkit addressed employment and other options. According to Mother, she had started working on that aspect of the transition plan in Chase's sophomore year of high school when Chase entered STEP and started taking occupational-type classes. Mother had investigated supported employment and adult day training but believed that Chase's level of functioning was too high for those particular programs. Mother stated that the goal for a disabled person was for the person to be in a competitive employment setting with nondisabled peers and natural supports in place.

¶ 33    Section four of the toolkit addressed housing. Mother stated that from the time of Chase's diagnosis, she had thought about the fact that at some point, she might not be here and Chase might need alternative housing arrangements. Chase's high school had held a meeting for parents of disabled children and had gone through the entire process of how to fill out the PUNS application form because the form could be very confusing. After the form was filled out, it was updated every year. Mother submitted Chase's application for the PUNS list in 2011.

¶ 34    As Mother's testimony on housing continued, she discussed the questions that she would ask if the time came for her to consider alternative housing arrangements for Chase. Mother would want to make sure that Chase would be happy, so she would consider such things as the staff turnover rate and the staff-to-resident ratio. According to Mother, those things were important because a young adult with autism thrived on structure, routine, and sameness. Mother stated that she did not think she needed a professional to advise her in that process but commented that she knew she had Ms. Bowen, the transition specialist, to guide her and to whom she could turn with questions. Mother also knew that if Chase's name got picked from the PUNS list, the facility that would be doing the screening had been trained to look at

what Chase's adult skills were at that point and to determine what type of residential setting would be best. Mother had listed in the toolkit all of the people that she had talked to at different agencies and the notes she had taken. Mother insisted that the notion of Chase living outside the home was not something that she had just started thinking about when Father entered this lawsuit. Rather, Mother had been thinking about the matter from the day that Chase was diagnosed.

¶ 35     When asked why she put Chase on the PUNS list instead of considering private pay, Mother stated that the cost of the residential facilities was between $55,000 and $75,000 per year, and she could not afford to pay that amount. Mother would have to rely, therefore, either on Father being ordered to private pay for Chase or on funding through the Medicaid waiver program. Mother did not know at that point whether independent or semi-independent apartment living would be an option for Chase and stated that it would probably be more of a group home setting where there was 24-hour supervision. Mother did not believe that Chase needed someone hovering over him 24 hours a day but did believe that he needed to have someone available wherever he was living in case there was a problem. Mother thought that in the future a semi-independent living apartment could be a possibility for Chase as they continued to work on his independent living skills but did not think that it was currently a possibility for him.

¶ 36     Section five of the toolkit discussed legal matters, such as obtaining supplemental security income (SSI) or social security disability insurance (SSDI) benefits. Mother stated that she had talked to the workers at the Social Security Administration (SSA) several times about the possibility of getting such benefits for Chase. Her application for SSDI benefits had been denied, but she was still waiting for a decision from the SSA on her application for SSI benefits for Chase. If Chase received SSI, he would also be eligible for a Medicaid card through the State. Currently, Chase's medical expenses were being paid through Mother's health insurance.

¶ 37     As her testimony progressed, Mother briefly described the remaining sections of the transition toolkit. Mother stated that the whole exhibit was a summary of what she had done in terms of transition planning, along with the workshops she had attended, the books she had read, the consultants she had brought into the school with her support group, and the speech and occupational therapy services Chase had received. In Mother's opinion, all of those things were part of the transition plan because they helped Chase reach his current level of independence.

¶ 38     When Mother and Father got divorced, child support for the two children was set at $1600 per month. In 2010 or 2011, Mother took Father back to court to get an increase in that amount. The amount was increased by about $600 to about $2285 per month. Father was pretty upset with Mother for going back to court and asking for more child support. According to Mother, she had asked Father twice to increase the amount of support voluntarily by $200 a month, but Father apparently refused. That was the first time since they had gotten divorced that Mother had asked for an increase in child support. When Kaitlin turned 18, the amount of support was reduced to $1700 per month.

¶ 39     As for her criticisms of Father, Mother claimed that (1) there were times when Father was with Chase when he was not particularly aware that Chase was ill; (2) the most amount of visitation time that Father had ever taken with the children in the summer was two weeks, even though Father was allowed six weeks of summer visitation under the joint parenting

agreement; (3) Father generally only called to talk to Chase about once every six to eight weeks but had started calling twice a week since Mother had been made temporary sole guardian in this case; and (4) Father had gone to only one of Chase's visits with Dr. Chez, although there were scheduling problems for Father with those visits.

¶ 40 During her testimony, Mother conceded or acknowledged that (1) from her financial affidavit, it appeared that there was about a $3000 shortfall between her income and expenses each month; (2) she could not say how much her household expenses would change if Chase was allowed to go to Florida or went into a group home; (3) if Chase stayed with her, she was going to need financial support from Father to help with Chase's expenses; (4) she had not visited any group homes in the Peoria area in the past 10 years; (5) she was invited to come to Florida during spring break to examine some of the resources there and to look at some of the facilities that Father was going to be talking about, but she declined to do so; (6) she was aware that Dr. Halperin had also testified or recommended as a possibility that Chase would be better off in a group home; (7) she had told Dr. Robyn Cohen (father's expert witness) that she was not comfortable filling out a parent questionnaire until it had been reviewed by her attorney and that based upon her attorney's advice, she was not going to be participating in the evaluation process; (8) she had talked to Chase about the differences between what she wanted for him and what Father wanted for him; (9) she had told Chase before the appointment with Dr. Kurth that part of the evaluation was to determine whether college was appropriate for him and was not surprised, therefore, that he perseverated with Dr. Kurth about having to go to Florida and about having to go to college; (10) in her deposition, she had estimated it would take Chase two to five years of living at home before she would even consider putting Chase in a group home; (11) she had probably told the GAL that she had no plans at the current time to move Chase out of the house; (12) if she was made guardian, it would be within her discretion to keep Chase at home indefinitely and to receive state services at home; (13) even if Chase's name had been picked from the PUNS list and that he had cleared all of the screenings, she would still visit the homes in question and would determine whether she thought those homes were appropriate for Chase; (14) she worked from 7 a.m. to 3 p.m. five days a week during the school year, and Chase worked roughly 3 p.m. to 7 p.m. three or four days a week; (15) she lived in a duplex, her parents lived in the adjoining unit, and there was a pass-through door that went between the two units; (16) her father bought items from people to sell on eBay and was robbed at one point at the duplex by two women and a man with a shotgun; (17) at one point many years ago, one of her nephews was arrested for having 1.4 pounds of cannabis in his car at a time when the nephew was living with Mother's parents in the adjoining unit next door; and (18) she did not tell Father about either the robbery or the drug arrest.

¶ 41 Regarding a note that Chase had presented to Dr. Kurth about why he wanted to stay with Mother in Peoria, Mother stated that she was not standing next to Chase when he wrote the note but she had read the note after Chase had written it. Mother had talked to Chase afterwards and had told him that she thought Father understood that a four-year college (something that Chase had mentioned in the note) was not a possibility. Mother had also explained to Chase that although he had said in the note that he wanted to live with Mother and his sister, that was probably not going to happen because his sister was probably going to get married after college.

- 10 -

¶ 42    When asked what assurances she could give the court that she would agree at some point to let Chase move out of the house and into a group home or assisted living facility, Mother stated that getting Chase as independent as possible had been the whole purpose of everything that she had done and that if Chase was ready for that step, she would do it. When the time came, in five to seven years, Mother would consult with and obtain guidance from the Community Workshop Training Center. In the meantime, according to Mother, Chase was going to stay in her home, and Mother was going to continue training Chase on life skills. Chase would also be working on those skills in the Focus program.

¶ 43    Mother agreed that she and Father had been completely unable to work with each other on the day-to-day details involving Chase, even with the help of outside assistance. Mother felt that Father would not be an appropriate guardian for Chase because Father was unrealistic in his expectations of Chase. Mother did not believe that Father would be physically there for Chase because Father traveled 26 out of 52 weeks of the year. Father and his family took many trips per year and Mother did not know how Chase would maintain any type of employment under those circumstances. Mother also did not believe that Father took Chase's needs and desires into consideration when he was making any of his plans for Chase.

¶ 44    Julia Smith testified for Mother that she was the director at Courtyard Estates in Peoria, a supportive living community that provided residential services to people over the age of 65. Chase was employed at Courtyard Estates as a dining room attendant and was doing well in that position. Chase was very polite and well mannered and stayed on task. Chase worked on average three hours a day, five days a week. He did not qualify for paid time off because he did not work the required number of hours. Unpaid time off was at the discretion of Smith. According to Smith, there was currently no possibility that Chase could obtain full-time employment at Courtyard Estates because he was unable to meet the requirements. For a full-time position, Chase would have to pass a cardiopulmonary resuscitation test, which both his caseworker and supervisor did not feel that he would be able to comprehend.

¶ 45    Kurt Mankle testified for Mother that he was employed at Richwoods High School as the work coordinator for special education. In that position, Mankle worked with special education students on work compatibility and job skills. Mankle had about 60 students per year. Mankle's goal for each student was first, to get the student some work experience; second, to get the student hired by an employer; and third, to keep the student competitively paid after graduation.

¶ 46    Mankle had Chase as a student for three years from Chase's sophomore year through his senior year. Mankle started Chase out by placing him in a voluntary employment position at the high school cafeteria, wiping down tables, so that he could get some work experience. That position was not a competitive employment position, and Chase had his aide with him while he was at work. Chase worked in that position for the first two years. While Chase was in his senior year of high school, Mankle placed him in another voluntary employment position in the high school library, shelving books. After that position, Chase was placed in a third voluntary position at the local public library, shelving books and alphabetizing things. Mother had found that position for Chase and had provided the information to Mankle. Chase worked at the public library for about half of his senior year and did so with the aid of a job coach (an adult who went into the workplace with the student and helped keep the student focused and on task). Chase's position at the public library was not a competitive pay position and was paid through STEP. The placement was successful for Chase in terms of

obtaining work experience but was unsuccessful in terms of a competitive pay situation. The public library was not going to hire Chase into a competitive pay position because he was unable to handle patron questions.

¶ 47    In addition to participating in the voluntary work positions, Chase also took a work skills class while he was in school. Mankle had talked to Chase at times about what Chase wanted to do in the future. According to Mankle, Chase's response would depend upon what he was doing at the time. If Chase was working in the library, he wanted to be a librarian. If Chase was working in the cafeteria, he wanted to be a custodian. In Mankle's opinion, Chase needed a repetitive job where he would come in and know exactly what to do, something with no variables where Chase did not have to initiate new tasks.

¶ 48    In the second semester of his senior year, Chase started working at Courtyard Estates. Mankle had other students that worked at that location and was able to obtain a position there for Chase. Chase cleaned tables and assisted residents in carrying food to their tables. Chase's position at Courtyard Estates was a competitive employment position where he was working with nondisabled individuals. According to Mankle, Chase did very well in the job switch from the public library to Courtyard Estates. Chase initially had a job coach at Courtyard Estates but was weaned off the job coach once the employer said that he was doing well.

¶ 49    In Mankle's opinion, Chase was capable of working in a competitive setting as long as there were specific parameters. With the limitations that Chase had, jobs were difficult to find in the Peoria area. It was hard to find competitive placement for a disabled student because many of the jobs that were available required multitasking, which some students with disabilities could not do. If Chase was unable to work at Courtyard Estates for some reason, transition specialist Leigh Bowen would help Chase find another job. Bowen worked on the cases of students who had graduated, and Mankle worked on the cases of students who were still in school.

¶ 50    Mankle stated that he had various contacts with Mother over the years at IEP meetings, parent-teacher meetings, numerous calls on how Chase was doing, and forms that Mankle would send home. To the best of Mankle's memory, Mother had attended every IEP meeting and every parent-teacher meeting, both of which were held once a year. Mankle also had some contact with Father over the past few years as well. When Chase was working at Courtyard Estates, Father had contacted Mankle by e-mail to request the address of Chase's employer and the name of Chase's supervisor. Father had also asked Mankle at one point to provide some materials to a neuropsychologist in Florida. As far as Mankle could remember, Father had been present for one parent-teacher meeting and one or two IEP meetings. Father did not, however, play any role in terms of the process that Mankle was engaged in with trying to find employment for Chase.

¶ 51    Juli Cranwill testified for Mother that she taught English as a special education teacher at the Peoria public schools. Cranwill had Chase as a student for all four years of high school. Chase had a one-on-one aide and was in some regular division classes and some special education classes. In addition to being Chase's teacher, Cranwill was also Chase's manager and wrote Chase's IEPs for 2011, 2012, and 2013.

¶ 52    An IEP was prepared every year for each special education student and set forth, among other things, the student's education goals for the following school year. The IEPs were prepared starting when the student was about 14 years old. That was when the teachers and

everyone else involved in the IEP process started to discuss with the student what the student's future path would be, whether it would be a vocational path or an educational path. As part of the process, Cranwill would interview the student, prepare learning objectives, and write up the IEP. A meeting would then be held with all of those involved, and they would talk about the IEP as a team and make adjustments.

¶ 53 Part of the IEP was transition planning for beyond high school. Starting with the 2011 IEP, Chase's desire for the future was to work at a library or at Peoria Production (a packaging facility). Chase did not want to go to college because he felt it would be too stressful. Cranwill believed that Chase's goals for after high school were realistic and that he understood what it meant to go to college and to have a job. In Cranwill's opinion, the fact that Chase had autism did not take away from Chase's ability to critically look at his life and to say what he did or did not want and what he was good and not good at. In addition, Chase was amenable to being taught new things, and Cranwill thought that Chase could be trained to do some computer work.

¶ 54 Cranwill had contact with Mother several times over the years at IEP meetings, parent-teacher conferences, and some phone conferences. Mother attended every IEP meeting and every parent-teacher conference. Mother would also contact Cranwill regarding questions or problems with things that were going on in class. Cranwill also had some contact with Father over the years as well. Father was present, either by phone or in person, for all of Chase's high school IEP conferences. Cranwill remembered in general that Father wanted to keep the doors open for Chase but could not remember any specific discussions that were had. In addition, in the spring of Chase's senior year, Cranwill attended a meeting at the school that had been requested by Father. Mother was not present for that meeting. At the meeting, Father asked some questions about the vocational program going forward, about Chase's future, and about programming for Chase after graduation. Father also contacted Cranwill a few times by e-mail. The e-mails did not, however, stand out in Cranwill's mind as being anything noteworthy. According to Cranwill, Chase appeared to have a good time with Father over the spring break during his senior year and showed her pictures of the things that he and Father had done together.

¶ 55 Leigh Bowen testified for Mother that she had been employed for the past 24 years by the public school district as a transition specialist. Bowen helped oversee STEP in the school district for the DRS and worked with disabled high school students in conjunction with the school's work coordinator, Kurt Mankle. Bowen provided job counseling and support services for the high school students who were in STEP and would help those students find, and be successful in, a job. Each year, Bowen had about 120 students and graduates who were on her caseload.

¶ 56 Chase was in STEP and was one of the students or former students who was currently on Bowen's caseload. Bowen had worked with Chase in his current placement at Courtyard Estates and in his previous placements at the high school cafeteria and at the public library. In 2013, Bowen prepared Chase's first individualized plan for employment (IPE), which served as a guideline as to what services Bowen would provide to Chase, such as job counseling and guidance, referrals to community resources, and job training. Chase would hopefully use those services to become, and stay, employed. In the current IPE, the employment goal for Chase was to be a nonrestaurant food server, such as in a nursing home. Although Bowen could close Chase's case after 90 days, she was most likely going to keep it

open until Chase's plan was up for renewal in April 2015. The only benefit to Bowen of doing so was that she would be able to see Chase succeed. If a problem arose, Bowen could renew Chase's case and could continue providing services for a longer period.

¶ 57    According to Bowen, Chase was doing well in his placement at Courtyard Estates, and there had not been any problems. Chase liked his job and was not bored in that position. Bowen viewed the job at Courtyard Estates as a good fit for Chase because Chase had a very supportive work environment; was not required to multitask or to make decisions on the job; and could go to work, do his job, and then go home, which was what worked best for Chase. The employment at Courtyard Estates was considered to be competitive employment because Chase was paid by the employer. That was the ideal goal for a person with a disability.

¶ 58    If Chase was to lose his job at Courtyard Estates for some reason, Bowen would help Chase fill out job applications and would work with another agency to get Chase services to help with job placement and coaching. Bowen believed that there would be another job out there for Chase but that it might be difficult to find. In Bowen's opinion, it was a little harder in the central Illinois area to find a job for someone like Chase because Chase was very concrete in his thinking and had a specific skill set. He was not able to do a lot of multitasking, which many of the available jobs now required. Other students with similar skill sets had been placed at Courtyard Estates and at hotels. Chase was not a candidate for an adult day training program or for sheltered employment because he was too high in functioning for those types of positions. When asked if she thought Chase was possibly too high in functioning for his job at Courtyard Estates, Bowen replied that she thought what Chase was doing at Courtyard Estates was a "perfect fit" for him at that point. Although the State's goal for disabled adults was for them to be placed into some type of full-time employment (40 hours per week), Bowen rarely saw that happen with the students with whom she worked.

¶ 59    According to Bowen, Chase had shown the ability to adapt by being able to move from the public library position to the position at Courtyard Estates without any significant incident. Chase could be taught new tasks and was generally agreeable to learning new tasks if they were presented and taught in the right way. Bowen had never evaluated Chase's computer skills but knew that Chase did well in math. Bowen believed that Chase could possibly do a job where he worked in a quiet office environment and entered numerical data from a piece of paper into a chart on a computer if he was properly taught how to do so.

¶ 60    Unless Chase complained, lost his job, or was otherwise unhappy in his position, his employment and skills would essentially remain the same. If an opportunity arose for a job that was higher pay or more hours and Chase was interested in it, he could fill out an application and would hopefully get an interview. Neither Mother nor anyone else had requested that Chase be evaluated for working at other jobs or that he receive additional vocational training.

¶ 61    Bowen had started working with Chase in July 2012 and had various contacts with Mother over the years. Initially, Bowen would see Mother at IEP meetings. However, as Chase got closer to graduation, Bowen had more contact with Mother, talking to her about different options for Chase's employment, because Chase was not competitively employed until right before graduation. According to Bowen, Mother had been very involved in working with her. Bowen also had some contact with Father over the years as well. Bowen had attended a meeting last spring at Richwoods High School where Father was present. The

purpose of the meeting was for Father to find out more information about the post-graduation possibilities for Chase regarding housing, education, and work. Father was interested in Chase going to college. The response of Bowen and the others at the meeting was that college was probably not the best fit for Chase. Bowen did believe, however, that Chase was a good fit for vocational placement. Since Chase had been working at Courtyard Estates, Father had not contacted Bowen at all to object to that placement, to express any negative concerns about the job, or to indicate that he believed that Chase was not reaching his full potential in that position.

¶ 62 Martha Atwater testified for Mother that she was one of Chase's special education inclusion teachers for kindergarten through third grade. Chase was in regular division classes at that time as an inclusion student with special education—that meant that Chase was in special education, that he had an IEP, and that the special education teachers designed a program for him, but he was still in a regular division classroom. Chase had a one-on-one aide and would come out of class for special assistance when needed.

¶ 63 While Atwater was Chase's special education teacher, she was never contacted by Father for any issues regarding Chase. Atwater had a lot of contact, however, with Mother. When Chase was in kindergarten, for example, Atwater was in daily or weekly contact with Mother for a while. In addition, before each IEP meeting, Mother would meet with Atwater and would talk to Atwater about Chase's current level of progress and about what Mother wanted to see happen regarding Chase's future progress. Mother would also call Atwater with questions about the IEP or about how things were going with Chase. In Atwater's opinion, Mother's relationship with Chase and her contact with the school were always very positive. Mother always knew the latest information on autism and what was going on at the school and was Chase's biggest advocate as to what she felt could be done for Chase.

¶ 64 Over the years, Atwater had seen Chase from time to time at different places in the community. At one point within the past two years, Atwater had seen Chase at a local restaurant with Father. Atwater observed Chase and Father for about 40 minutes. According to Atwater, during that entire time period, Father was on an electronic device and did not interact with Chase at all. That was the only time that Atwater had ever seen Chase and Father together.

¶ 65 Lisa Humke testified for Mother that she had been employed for the past 19 years by Central Illinois Service Access (CISA). CISA had a contract with the DHS whereby CISA would facilitate the placement of intellectually disabled persons into services within a nine-county area in central Illinois. CISA would assist disabled persons in signing up for the PUNS list and would conduct preadmission eligibility screenings of those individuals in the area whose names were selected from the list. If a person was found to be eligible, CISA would help place that person into residential or vocational services. Humke was an individual service coordinator for CISA. Her specific job function was to screen individuals for eligibility standards and to facilitate getting them into services. A preadmission screening would basically explore the individual's diagnosis, how the individual met the state criteria, and what the individual's deficits were. Humke completed about 30 preadmission screenings per year.

¶ 66 According to Humke, when people talked about services for disabled persons, they were usually referring to the Medicaid waiver program, a system of state and federal funding that was used to provide residential and vocational programs and services to specialized

populations. A person with autism was potentially eligible for services through the Medicaid waiver program if he or she was classified as a developmentally disabled person. The determination as to whether a particular individual met the eligibility criteria would be made when a preadmission screening was completed after the individual's name was picked from the PUNS list.

¶ 67 There were many different types of residential settings that were available under the Medicaid waiver program, such as an individual apartment, a group home, a community living facility, and an immediate care facility. In addition, a disabled adult could live at home with other family members and be provided with an allotment of funds that could be used to purchase desired services. Most service provider agencies were based on Medicaid waiver funding, but an individual could choose to private pay instead. For an eight-bed group home, the Medicaid waiver rate would typically range from $50,000 to $80,000 per year.

¶ 68 If an individual was found eligible for the Medicaid waiver program and accepted into a particular facility, he would typically have to pay over the majority of any SSI or SSDI that he received to the service provider to help offset the cost of his care. The individual would generally get to keep only a small percentage of his SSI or SSDI for his own personal needs. The only residential setting that was exempt from that rule was the home-based setting. In that setting, the individual's SSI or SSDI was still considered to be part of the family income and did not have to be turned over.

¶ 69 The PUNS list was the waiting list that Illinois enacted to be the mechanism for how an individual got into Medicaid waiver program services. An exception to the PUNS list could be made in the case of an emergency or a crisis. In 2008, there were 20,000 people statewide on the PUNS list. That was the last time that the number of people on the PUNS list was released. Humke believed that the number had gone down since that time because, as a result of a lawsuit, the State was required to pick 500 people off of the PUNS list each year. Selection from the PUNS list, however, was random and was not a guarantee of eligibility for Medicaid waiver services. Rather, selection was considered to be an invitation to the individual to apply for services. At that point, a preadmission screening would be done to insure eligibility and to facilitate connecting the person with a service provider. If a person did not want Medicaid waiver services but wanted to go into one of the residential facilities as a private pay, a preadmission screening would be done at that time as well. CISA was the only organization that administered the PUNS list and the preadmission screenings in the area that CISA served.

¶ 70 There were about 20 residential service providers in CISA's nine-county area. The number of beds available varied depending on the service provider. A provider was not mandated by the State to accept into its facility any particular person who was seeking placement. Rather, a provider could look for a certain individual who would be a good fit with that particular site's current population. Although there was no shortage of beds in residential facilities in the central Illinois area, there were certain facilities that were at full capacity and did not have open beds. If an individual family wanted a particular service provider, they could wait for that service provider to have an open bed available without having to go back on the PUNS list. The same was true if a particular placement did not work out. At that point, CISA would get involved and would assist the family in finding a new placement that would meet the individual's needs. In addition, there could be issues with a group home that could make placement unsuccessful. For example, the individual's

behavioral or medical needs could be above what the service provider felt it was capable of providing. There had also at times been instances of violence between people in group homes, although those instances were rare.

¶ 71 Once a person was selected from the PUNS list, went through the preadmission screening, and was found to be eligible for Medicaid and Medicaid waiver services, CISA would meet with the person and his or her family to inform them of all of the different options available and to explore what type of services they were interested in. After the person and family chose the particular services that they were interested in, CISA would facilitate referrals to entities that provided those types of services.

¶ 72 During her testimony, Humke confirmed that Chase was on the PUNS list. Humke could not provide an opinion as to when Chase would become available for Medicaid waiver services because the State followed a random selection process in picking from the PUNS list—it could be as soon as six months or as long as five years. According to Humke, if a disabled person was working full-time and was making more than the Medicaid waiver amount, the person would no longer be eligible for services, although there were ways to offset that income. The amount that could be put into an individual's own account from income could not exceed $2000 a month or the person would not be eligible for Medicaid services.

¶ 73 Kaitlin McHenry testified for Mother that she was 20 years old, was Chase's older sister, and was currently a junior in college. When Kaitlin was not in school, she lived in Peoria with Mother and Chase. According to Kaitlin, her parents divorced in 2001 when she was 7 years old. Father had visitation with Kaitlin and Chase over the years since the time of the divorce up through the present date. Mother had always insisted that Chase fly to Florida in the company of another adult and not just with Kaitlin. Up until the most recent spring, every time that Chase went to Florida to visit Father, Kaitlin went with him. While in Florida with Father, Kaitlin and Chase would go to amusement parks, to the beach, to movies, bowling, or out to eat. Most of the time, Father's wife, Leigh, would go with them as well. Once in a while, Father would watch a movie with just Kaitlin or go on an errand with just Chase, but that did not happen very often.

¶ 74 Chase and Father's wife, Leigh, got along very well. Leigh was nice to Chase, and Chase liked seeing her when he was in Florida. A lot of the time, Father would be working when Kaitlin and Chase were in Florida for their visits with him. In addition, Leigh would be in her room a lot of times but would come out and interact with Kaitlin and Chase when it was meal time or if they were all watching a movie together. Chase also got along well with Leigh's 11-year-old daughter, Texie.

¶ 75 During her testimony, Kaitlin confirmed that there were times when she observed Father not being attentive to Chase's needs and described some specific instances of when that occurred. Kaitlin also described times when she, Father, and Chase were together, and Father, in Kaitlin's opinion, had not interacted much with Chase. In addition, according to Kaitlin, Father had talked to her about the guardianship at issue in this case at least three times over the past year. Kaitlin described those conversations and stated that during one of the conversations, she had told Father that she believed Chase should stay with Mother because Chase wanted to stay in Peoria and because Father did not really understand Chase's capabilities. Father had also talked to Kaitlin a few times about Chase working for Father's business.

¶ 76    Kaitlin stated further that when they were growing up, Mother was always very involved in Chase's schooling and in making sure that his needs were met. When Chase first started school, Kaitlin saw Mother put together a program where she would bring college students into the family home to work with Chase on different skills to help him be more prepared for going to school. Throughout the years, Kaitlin saw times where Mother had issues with the school district because they would want to put Chase in a program that was not appropriate for him, would not have the right kind of program, or would want to take away Chase's one-on-one aide. Mother always fought to make sure that Chase had whatever he needed. Kaitlin had also seen Mother working with Chase on daily living skills, such as teaching Chase how to make different drink mixes, how to cook items in the toaster, and how to make simple meals for himself. Chase was also starting to learn how to do laundry. In addition, Kaitlin was aware that Chase knew how to use the microwave and how to use a key to open the door and that Chase had recently started taking the bus to work at Courtyard Estates.

¶ 77    Over the years, Kaitlin had seen Chase have meltdowns at times. When Chase was little, if he had a meltdown, he would throw himself down, scream, and bang his head on the floor and the wall. The last time that Kaitlin saw Chase have a meltdown was about two weeks ago when there was a miscommunication over Kaitlin taking Chase to the pool. Chase escalated and stomped off to his room and said that he was not going to do anything the following day. Chase then went downstairs and continued to talk about the incident for about 20 minutes. According to Kaitlin, it normally took Chase at least half an hour to calm down after an incident like that.

¶ 78    Kaitlin was familiar with the note that Chase had written to give Dr. Kurth about why he wanted to live in Peoria with Mother. Kaitlin knew that Chase had written the note because she was home at the time. Chase wrote the note because he knew he had an appointment coming up with Dr. Kurth and that he was going to have to say why he wanted to stay with Mother. Chase was stressing out about trying to put his feelings into words. He sat down at the dining room table and wrote out the note and said out loud everything that he was writing. According to Kaitlin, that was one of the ways that Chase would think. Mother and Kaitlin were sitting in the living room at the time, and Kaitlin could hear Chase speaking out loud.

¶ 79    According to Kaitlin, Chase had never gone to a summer camp for autistic children or for children with special needs. Chase had opportunities to participate in different daytime activities through HISRA during the summer but did not want to. Mother would not make Chase participate in those activities if he did not want to do so. Kaitlin thought it was acceptable to transition Chase into doing new things in steps but did not think that Chase should be forced into something completely different from what he had experienced before. Since it was summertime, Chase would swim and do different activities at home during the day, like reading and shooting baskets in the driveway. Kaitlin had no concerns about Chase being home by himself during the day and stated that she believed that once the legal process was over and it was clear where Chase was going to be living, there would be more stability for Chase to get involved with additional activities and to potentially increase his hours at work.

¶ 80    Kaitlin's grandparents lived in the duplex unit that adjoined Mother's unit. Kaitlin's grandmother was on oxygen. Kaitlin did not know to what extent her grandparents interacted with Chase when he was home during the day because Kaitlin was not usually home at that

time. It had been at least five years since Kaitlin's cousin had lived next door with her grandparents. That cousin had been arrested at some point for possession of marijuana, but Kaitlin did not know if that occurred at the time that her cousin was living with her grandparents. Kaitlin stated that there was no chance that her cousin would come back and live with her grandparents in the future because her cousin was engaged, was living in a house, and was looking to buy a different house. Kaitlin did not believe that Chase was aware of any of her cousin's activities.

¶ 81 According to Kaitlin, Mother had stated at times that Father was not really willing to listen to other people's opinions on the situation with Chase. Father had not specifically told Kaitlin what his plans were for Chase if Chase came to Florida and had said different things to Kaitlin about the matter at different times. Kaitlin was aware that Chase had said that he wanted to live with Mother and with her. Kaitlin had not discussed with Chase where she would be living after college, although she had mentioned that she would probably be getting married. Kaitlin stated that she had no reason to believe that it would affect Mother financially if guardianship was given to Father and Chase moved to Florida. Kaitlin agreed that her parents were fundamentally unable to cooperate on issues related to the guardianship of Chase, and she did not see any possibility that the situation would get any better.

¶ 82 If Kaitlin had to make the decision, she would choose Mother to be the guardian of Chase. Kaitlin knew that Mother had been working very hard to make sure that Chase had the services lined up that he needed for the future so that one day when Mother could not take care of him anymore, he would have the funds and the possibility of a place to go. Mother made sure that Chase had job opportunities. She listened to Chase's opinion and factored that into her decisions about where to go next with the process. Kaitlin did not think that Father should be guardian because she did not think that Father fully understood Chase's capabilities. Kaitlin also did not think that Father knew the different services that Chase needed or how to obtain those services or that Father was willing to listen to the opinions of other people who had more experience with Chase, if those opinions were not in line with his opinion. Kaitlin and Chase were close, and Chase had told Kaitlin that he absolutely wanted Mother to be his guardian.

¶ 83 Dr. Shanna Kurth testified for Mother by way of evidence deposition that she was a clinical neuropsychologist and was currently employed by her own corporation. Kurth described her background and experience in detail. Among other things, Kurth had been a clinical neuropsychologist since 1993, had been licensed in Illinois since about 1994, and had been board certified in clinical neuropsychology since about 1997 or 1998. Kurth described the practice of neuropsychology as a diagnostic type of practice in which the doctor's role was to identify the absence or existence of a particular brain impairment. Kurth's practice consisted of 100% neuropsychology (assessment and activities related to assessment); she did not engage in direct counseling of patients or in transition counseling. Kurth assessed approximately 180 to 200 people per year, a small portion of which were young adults or adults with autism spectrum disorders. When Kurth assessed an adult on the autism spectrum, the person being assessed always came in with a referral question, such as whether the person was capable of driving, whether the person was capable of living on his own, or whether the person's relationship with other family members was being impacted by the

person's autism spectrum behaviors. Every evaluation that Kurth conducted was composed of three aspects: the record review, the clinical interview, and the objective test results.[2]

¶ 84    In this particular case, Kurth conducted an evaluation of Chase in December 2013. The referral question centered upon appropriate placement for Chase following his graduation from high school and his potential for employment. Kurth saw Chase just that one time when she conducted the evaluation. Mother came with Chase to the evaluation, but Father did not. Kurth had communicated to Father's attorney prior to the evaluation that she wanted to interview Father, so she was a little surprised that Father was not there when the evaluation was conducted.

¶ 85    During her testimony, Kurth described in detail the clinical evaluation that was conducted on Chase. As part of the assessment process, Chase participated in two rounds of testing and was also interviewed by Kurth. Chase was able to maintain focus for the entire testing and interview process and did not have any emotional outbursts that day. The interview of Chase took place in the presence of Mother. At the end of the interview, Chase gave a handwritten note to Kurth listing the reasons why he wanted to stay in Peoria with Mother. The contents of the note were consistent with what Chase had verbally expressed to Kurth during the interview. Kurth did not know how the note was prepared and did not believe it was relevant to her clinical assessment of Chase. Kurth also did not know how Chase got the idea that he would have to go to college if he went to Florida, as expressed in the note, but stated that it was very common for an individual on the autism spectrum to take an off-handed comment, which did not mean what the individual perceived it to have meant, and to latch onto it and perseverate on it. Kurth agreed that with a person like Chase, one could not really teach him how to accurately imagine the future; he lacked the skill or ability to extrapolate from the information that he had. If Chase was told that he might be going to live in Florida, he would not be able to extrapolate what that meant. In addition, according to Kurth, the reasons that Chase had given for where he wanted to live could not really be relied upon as an accurate analysis of what was best for him. Those reasons did tell, however, what Chase valued and what was important to him.

¶ 86    Following the interview of Chase, Kurth conducted an interview of Mother. Prior to that time, Mother had been given questionnaires to fill out that were designed to elicit details regarding Chase's behavior, his ability to cope, and his emotions. Mother told Kurth during the interview that Chase's outbursts were becoming rarer as time went by and that Chase was showing signs of self-modulating behavior (that Chase had learned some type of coping strategy to help calm himself down when he was starting to become very upset). Kurth did not know if others were prompting that behavior but stated that regardless of whether it was prompted or unprompted, that behavior was a very positive sign for Chase.

¶ 87    As part of her testimony, Kurth described in detail the behavioral observations that she had made of Chase. Among other things, Kurth noted that Chase was perseverative, which meant that he repeated a statement or a behavior over and over again, a common behavior that was seen with individuals with neurologic deficits. One of the perseverative topics for Chase was that he was very keen to stay in Peoria and to live with Mother and to make sure that Kurth understood his reasons for that. Chase seemed to be under the impression that

_____

[2]Both of the neuropsychologists who testified in this case testified in detail about the records that they had reviewed in conducting their evaluation of Chase.

Kurth would be making the decision, even though Kurth tried several times to correct that misperception. Kurth also observed that the content of Chase's speech was very concrete and simplistic and that he had a very literal interpretation of the words spoken with little to no abstraction or interpretation outside of the actual words. As was common for a person on the autism spectrum, Chase showed significant strength in some areas, such as math and spelling. However, his verbal problem solving and reasoning skills were a significant weakness for him, and he had difficulty with most aspects of executive functions, such as mental flexibility, higher-order problem solving, reasoning, insight, and judgment. In addition, Chase's reading comprehension skills were at about a third-grade level.

¶ 88    When Kurth was asked during her testimony about her impression or opinion of Mother's willingness to get involved to give Chase a better life, Kurth stated:

"I think that she left no stone unturned. I think that she was at least vigilant, if not obsessive, about making sure that she contacted every source, that she obtained every possible resource for him, and in particular she made sure that his teachers were well aware of his issues and she made sure that they were as much as possible implementing the behavior program that was developed for him."

¶ 89    Regarding the referral questions, Kurth opined that the most likely result for Chase in terms of his independence would be for him to be in a group home where there would be a staff member present at all times. Kurth described that possible outcome as a "stretch" or "reach" for Chase but stated that she thought it was worth the effort to try to get Chase to that point. Kurth did not think that Chase would be able to live any more independently than that. The reason that Kurth believed that a group home setting was currently a stretch for Chase was because Chase's flexibility was currently minimal, his emotional maturity was currently low, his behavioral self-modulation was just emerging, and there was a list of daily-living skills that Chase needed to master first. Kurth believed that there was a fair chance that Chase would be successful in a group home setting and was reasonably confident that Chase would be successful in making the transition to that type of setting. Kurth also believed that Chase was capable of a transition to Florida and that some care would need to be taken to provide support if that were to occur. According to Kurth, the transition to a group home setting would not be easy regardless of whether it was done in Peoria or Florida. Kurth believed, therefore, that there needed to be a "plan B" in case Chase was not successful. Kurth was not asked to find out what group homes were available in Peoria, so she could not state how many or what type of group homes or transition resources were available at that time in the Peoria area. Kurth also had no idea what resources were available for Chase in the Orlando, Florida, area.

¶ 90    In Kurth's opinion, the goal for Chase was to get Chase to the greatest degree of successful independence possible. Kurth acknowledged that successful independence would require a certain amount of comfort for Chase but agreed that making sure Chase was comfortable 24 hours a day, 7 days a week, was not necessarily what was best for Chase. Kurth described the risk of "caving" as a risk of decreased social interaction and regression of social skills that could arise in a particular situation. That risk applied to everyone, not just Chase, and was caused in part by letting a person do only what was comfortable and by not forcing the person into some type of social interaction or social risk as part of that person's daily routine. According to Kurth, if someone was regressing, the window in which that problem could be addressed and corrected was only a few months because after that amount

of time, that new pattern of behavior would become very entrenched and would be increasingly more difficult to change. Kurth also agreed that a lack of direct supervision during the day was a risk for Chase.

¶ 91 According to Kurth, anyone who became Chase's guardian would need professional assistance to outline a plan for Chase's future. During the evaluation, there was nothing that led Kurth to believe that Mother would not follow through with the wishes and assistance provided by professionals in helping to develop Chase's plan. Mother had done so in the past "with a vengeance," according to Kurth, and it had been "a heroic effort" on Mother's part. Kurth stated that Chase was very much like a typical individual on the autism spectrum as well as a typical adult teenager. The things that made Chase comfortable were a routine, familiarity, and predictability, which made sense because Chase was not very good at predicting. In addition, Kurth suspected that Chase, like many other teens, was more comfortable being by himself and being entertained by activities that had no emotional or social risk, such as playing video games, watching television, or reading books. In Kurth's opinion, with regard to Chase making a successful transition, the robustness of the support system and programs available would be less important than the demands upon Chase's flexibility and emotional maturity. The key factor was not necessarily to scour the planet to find the best program. Counseling and peer groups and so on were very helpful and were important, but they were less important than the foundation, which would be emotional maturity, flexibility, and familiarity.

¶ 92 As for employment, Kurth believed that Chase would always need some kind of support. Kurth opined that at best, Chase would be able to participate in competitive employment of a part-time nature that was very repetitive and consistently monitored by some kind of liaison with the employer. Chase's strength as an employee was that he was very regulated by rules and highly focused on details, as was typical for an autistic individual. Once Chase understood the job and was trained to a point where he could perform each task individually, step by step, he could be relied upon by the employer. Chase's weaknesses as an employee, however, were that he was vulnerable to being easily overwhelmed and was not able to think on his feet or to generalize (to apply what he had learned in one situation to another). Kurth believed, therefore, that Chase should not be doing any type of problem solving or decision making and thought that there was some potential for emotional outbursts if Chase became overwhelmed or if he misinterpreted events, which was quite a likely possibility in certain settings. Chase was not a good fit for a job dealing with the public, unless that job was very structured. Chase could perform a data-entry type of job but could not perform any type of job that required problem-solving skills. In Kurth's opinion, if Father was recommending some type of focal job skill training for Chase, such as computer classes, keyboarding, or training in database entry, that might be an appropriate use of educational supports for Chase.

¶ 93 A copy of Kurth's written neuropsychological report was admitted into evidence. In the recommendations section of the report, Kurth stated, among other things, that her opinion was unequivocal on the issue of college—that Chase was not a candidate for higher education under any circumstances. Kurth went on in the report to explain the reasons behind that opinion in detail. The remainder of Kurth's recommendations in the report were consistent with what she had stated in her testimony.

¶ 94 Lori Ewing Crim testified for Father that she was a special education teacher at Richwoods High School in Peoria and had taught Chase during his senior year of high

school. Crim had Chase in two classes, diversified occupations and study skills. Chase was a very good student and a very hard worker. Crim did not have any behavioral problems with Chase whatsoever. Chase was willing to learn and to be taught new things. Chase had shown Crim pictures from the spring break that he had spent during his senior year in Florida with Father. Chase was excited to show Crim the pictures and was also excited that he had permission to use his phone to do so. Chase did not make any negative statements about that Florida trip or about being with Father. Crim saw Chase in school at around the same time that Chase had allegedly written the note about why he wanted to stay in Peoria with Mother, and Chase made no statement of any type to Crim about not wanting to work for Father or about not liking to go to camps. Those topics, however, did not come up.

¶ 95    Leigh McHenry, Father's current wife, testified that she had been married to Father for just over eight years and that they resided in Windemere, Florida, with Leigh's 11-year-old daughter, Texie. During that time period, Kaitlin and Chase would come to visit them in Florida periodically. When Chase came to Florida for a visit, he was usually excited to go swimming; to go to the amusement parks; to interact with Father, Leigh, and Texie; and to participate in all of the activities that they had planned for him. At times, when Kaitlin and Chase would visit, Leigh would leave the room after Texie had gone to bed, so that Kaitlin and Chase could have some alone time with Father. In the past few years, Leigh had not noticed any problems with Chase when he arrived in Florida to visit or when he was about to depart to go back home. Chase had not had any behavior difficulties or meltdowns. Rather, according to Leigh, Chase had been wonderful socially in terms of interacting with Leigh and her family.

¶ 96    During the past Christmas vacation, Chase, Kaitlin, and Kaitlin's boyfriend came to visit for about six days. Leigh spent several hours alone with Chase during that period. While Chase was in Florida, Leigh and Father purchased an iPhone for him. Chase loved the phone and learned how to turn it on and off very quickly. He was very happy and pleased with himself to demonstrate to the family that he could do so. Chase was able to use some of the applications on the phone, and Leigh helped him transfer his movies and games to it. Chase was able to access those things on his phone without assistance and was able to send text messages and pictures.

¶ 97    The past spring break was the first time that Chase had ever come to Florida without Kaitlin. That particular visit lasted six or seven days, and Father and Leigh were both present in the household for all of those days. Leigh noticed during that time period that Chase tended to make more decisions for himself since Kaitlin was not present. During the visit, Leigh spent some time alone with Chase and took him to Downtown Disney. They went shopping, had lunch, walked around and enjoyed the sights, and were alone together for several hours. That was the only time that Leigh spent alone with Chase during that vacation. The longest time that Leigh had spent alone with Chase at any one time was probably no more than four hours. According to Leigh, Chase was exposed to a number of new activities while he was in Florida and did not show fear or any type of negative reaction.

¶ 98    Leigh worked from home for Father's business, McHenry Consulting. She would review documents for Father, help with travel arrangements and with marketing, do administrative assistant work, and just try to take some of the burden off of Father. She was paid $2000 per month for her work. The number of hours that she worked varied depending on what was going on. According to Leigh, Father had opened a local office that was only about 10 to 15

minutes away from their house and was much closer than Father's Tampa office. Father worked out of the local office four days a week and out of the Tampa office one day a week. Father had also cut down on the amount of his travel over the past year or two by hiring additional people and by using computer-based services for meetings. Father currently was gone for business five to seven days a month. Leigh understood, however, that if Chase had some type of emergency, the kids came first, regardless of whether Father was at a worksite or social activity and regardless of whether Leigh was busy working for Father's business.

¶ 99 According to Leigh, Chase seemed to be a very visual learner—after she showed him how to do something once or twice, he would pick up on it. Leigh had helped teach Chase how to use his cell phone and how to make a bowl of cereal in the morning and believed that Chase was comfortable with her. She also believed that Father was capable of fulfilling the role of Chase's guardian in this case.

¶ 100 Since September 2013, Leigh had taken four trips. The previous year, Leigh had taken about three trips. Kaitlin and Chase did not travel with Leigh or Father at all last year but did take a seven-day cruise with them in 2012 and a three-day cruise in 2013. According to Leigh, if Chase was living with her and Father, he would travel with them if he was available. If Chase was not available, Leigh would subordinate her travel plans to Chase's needs.

¶ 101 At the home where Father and Leigh lived in Florida, Leigh and her mother held title to the property. Father's name was not on the title. If Father was made guardian and if a residential placement for Chase was not feasible, Chase could live with Father and Leigh for as long as was necessary, even for the rest of his life. Although there were no plans for Chase to live with Father and Leigh for a substantially long period of time, such as five or seven years, Leigh had no problem with him doing so, if that was necessary.

¶ 102 In Father and Leigh's marriage, Father handled the household finances, and Leigh could not say how much of the household budget they could spend to place Chase into residential placement if they had to use their own funds. Leigh believed that they would do what was necessary to make ends meet so that Chase could be in the best place possible. There were two residential schools that Father and Leigh had looked at for Chase—CIP and Vanguard—both of which were one-year transition schools. CIP was approximately $55,000 to $86,000 per year for tuition and housing, and Vanguard was approximately $58,000 per year for tuition and housing. According to Leigh, if their team of experts felt that one of the two residential schools was the best place for Chase and if no public or government benefits were available to pay for those costs, she and Father would commit what they could personally, and Leigh could always make up the difference herself. More specifically, Leigh stated that if the experts thought that going to one of those two schools was the best thing for Chase to make him independent, she was willing to commit her own funds to make it happen, even if it was $50,000 to $60,000 or more. Leigh and her family had their own private funds and were willing to use those funds to make up whatever amount Father could not afford to pay for by himself. Residential nonschool placements, on the other hand, were substantially cheaper in Florida than the residential school placements. One such residential nonschool placement, Trinity, was approximately $2000 per month, which was only $300 more than Father had been paying in child support just six months ago. Father could pay that amount just out of his own income.

¶ 103    Dr. Robyn Cohen testified for Father that she was a pediatric neuropsychologist and that she worked at a children's hospital and also at her own private practice. Cohen described her background and experience in detail. Among other things, Cohen was licensed as a psychologist in the state of Florida and was finishing the process of obtaining her board certification, although she had previously been board certified as a behavior analyst from 1999 to 2011. One of Cohen's partners in her private practice was her husband, who was a board-certified rehabilitation psychologist. As part of her practice, Cohen provided diagnosis, counseling, and planning, including the beginning parts of transition planning. According to Cohen, about 50% of her patients were on the autism spectrum, and she treated about 25 to 30 patients a year that were transitioning from school or a home environment into a group home or semi-independent living situation. Cohen was, therefore, familiar with group housing options and other services that were available to autistic spectrum patients throughout central Florida.

¶ 104    Cohen got involved in this case after Father contacted her at her private practice and asked if she would be willing to do a neuropsychological evaluation of Chase, to assess his strengths and weaknesses, and also to aid Father in transition planning if Chase was to relocate to central Florida. Father's purpose in obtaining the evaluation was to get a real understanding of where Chase was at, what his potential was, what the realistic goals were for Chase in the future, and what resources were available in central Florida to help Chase achieve his maximum potential. As part of her procedure, Cohen would normally obtain questionnaires from and interview both parents. In this particular case, however, Mother indicated over the phone that she was not comfortable answering questions. Mother told Cohen that if there were questions that either Chase or Father could not answer, she would answer those questions after her attorney had reviewed them. Cohen assured Mother that she was not going to be determining who the guardian should be or where Chase should live but was simply going to be performing an evaluation and aiding with transition services in central Florida. Mother eventually provided Cohen with written materials but did not participate in a verbal interview. Cohen had never had a situation before where a person wanted to have her attorney review the written materials before responding or refused to participate in an interview based upon legal concerns.

¶ 105    During her testimony, Cohen identified a copy of the written report that she had prepared in this case. The report was signed by both Cohen and her husband. Cohen went through her report in depth, describing the process that she followed and responding to the specific questions of the attorneys. Regarding possible placement, Cohen stated that she believed that Chase would function well in a group home and recommended that Chase have as a goal some sort of semi-independent living option. According to Cohen, there was an abundance of group homes and structured semi-independent apartments available in central Florida for disabled adults. That abundance allowed service providers in Florida to group individuals by functioning level so that there would be very similar individuals living with each other in residential placements. Cohen believed that it would be very likely to achieve that type of situation for Chase in Florida. Cohen acknowledged, however, that Chase had expressly told her during the evaluation that he wanted to live at home in Peoria with Mother. Cohen went on to describe as part of her testimony how she would assist Father in transitioning Chase to Florida if Father was appointed guardian.

¶ 106    Cohen recommended, among other things, that services continue for Chase throughout his adult life. In central Florida, there were a lot of resources for autistic adults that were very beneficial in maintaining and developing continued social and vocation skills and in increasing quality of life. Florida had many resources for autistic individuals because much of the behavior analysis community had actually formed in Florida. In fact, Florida was one of the first states to certify behavior analysis, which was one of the most important treatment modalities for autism.

¶ 107    Cohen confirmed during her testimony that her report was very similar to the report of Dr. Kurth and that she was in substantial agreement with Dr. Kurth's findings and testimony. The main difference between Kurth's report and Cohen's report, in Cohen's opinion, was that Kurth mentioned group home living as a goal that might or might not be attainable for Chase, while Cohen believed that group home living was an attainable goal for Chase and that semi-independent living was also a possible goal for Chase. Cohen acknowledged that she was not in any way stating that Father would be a more appropriate guardian for Chase than Mother and that she was not expressing any opinion as to which parent would be the preferred guardian. Cohen conceded that she was not familiar with group housing options or other services that were available for persons with autism in central Illinois and acknowledged that group homes in Florida and other services were usually paid for through the Medicaid waiver program. Cohen acknowledged further that there were a lot of people on the waiting list in Florida for those services and that if the plan was to place Chase in a residential living facility in Florida in a short period of time (within a few years), the only way to do so was through private pay.

¶ 108    Cohen testified further that it was not typical to create a formal transition plan with timelines and deadlines for an autistic adult. According to Cohen, if persons on the autism spectrum were asked whether they wanted to continue living in the same place with the same people or to go some place different, close to 0% would say that they wanted to go some place different. Cohen agreed, therefore, that if the court was going to ask Chase questions, the weight the court should give those answers was limited by Chase's own cognitive limitations.

¶ 109    Father testified in his own case-in-chief that he lived in Windermere, Florida (West Orlando) with his wife, Leigh, and his stepdaughter, Texie.[3] Father had been married to Leigh for just over eight years. Father had an accounting background, owned his own consulting firm, and had earned $150,000 to $160,000 last year. The number of hours that Father worked per week varied.

¶ 110    During his testimony, Father described his plan for Chase at length and presented a slideshow and written presentation of his plan to the court. According to Father, his plan at that point was more of a process because he had not had Chase in Florida to meet with the different groups. There were four main components to Father's plan: employment, independence, quality of life, and finance. Father described in detail many of the different services and facilities that were available for autistic or disabled adults in the central Florida area that he could possibly take advantage of if he was appointed Chase's guardian. Father

[3]Father was also called to testify as a witness in Mother's case-in-chief. Since the testimony presented at that point of the case was very similar to the testimony presented by Father in his own case-in-chief, we have only set it forth here.

also named and discussed the experts who would be working with him as part of his "team" and what each expert's involvement in the process would be.

¶ 111    In discussing his plan for Chase, Father described the cost of some of the services that were available in Florida, including the two residential transitional schools, CIP and Vanguard, that Father's wife, Leigh, had already testified about. The two residential transitional schools were immersive programs that combined in one source multiple services, such as housing; social and networking services; vocational, educational, and life skills training; and ties to employers and schools. According to Father, CIP was a one- to three-year program that cost about $62,000 to $70,000 per year for tuition and housing. Vanguard, the other residential transitional school, had a tuition rate of about $48,000 per year. When asked at what point he would start to consider placement in one of the residential transitional schools as part of his plan for Chase, Father stated that it would be after he had gotten Chase to Florida, had gotten Chase evaluated by certain members of his team, and had been given the go-ahead to put Chase into one of the programs by those team members. Father stated further that it was his intent to enroll Chase in one of the residential transitional schools, once Chase had gotten established and everything was going well, if his advisory team indicated that the residential transitional schools were the best route to go. As for the cost of some of the nonschool residential living facilities, Father stated that one group home, Attain, was $2500 to $3000 per month for private pay and that another group home, Trinity, was $1800 per month.

¶ 112    According to Father, Florida had a state agency, the Center for Autism and Related Disabilities (CARD), which was specifically devoted to autism. CARD had multiple offices throughout the state and sought to promote full participation in life for autistic individuals. As far as Father was aware, there was no comparable state agency in Illinois for people on the autism spectrum. Some of the other resources that were available for Chase in Florida were the Special Olympics; Camp Thunderbird; a group called Opportunities, Community, and Abilities (OCA); travel, entertainment, and vocational opportunities; church; and fitness facilities. Father also included in his plan time for Chase to spend with Mother in Illinois.

¶ 113    With regard to financial concerns, Father stated that he had a checking account with Chase's name on it, which had approximately $1200 in it. Chase had the debit card for that account. Father had also set up a special needs trust for Chase. Father had placed a few hundred dollars into that trust and had named the trust as a partial beneficiary on some of his life insurance policies and on his retirement account. The trust was revocable by Father up until the time of his death. Father acknowledged that setting the trust up that way meant that Father had the absolute right to add or remove property from the trust up until the time of his own death. Under the terms of the trust, Father also had the absolute right to control the distribution of income and principal from the trust. In addition, Father commented that he was considering possibly purchasing a condominium in the trust's name so that Chase could share that living space with other similar individuals, who would pay rent, and could still have the value of that property as a trust asset later on. Father understood that the purpose of a special needs trust was to shield assets from being considered as available for governmental program purposes. It was Father's opinion that Chase would be accumulating money for his financial future under Father's plan but would not be doing so under Mother's plan. Father also believed that appointing him as Chase's guardian would make a more efficient use of Father's financial resources and was a stronger plan from a financial standpoint. Father

explained that if he was made Chase's guardian, he would only have to plan for two retirements—his and Chase's. Whereas, if Mother was made Chase's guardian, Father would potentially have to cover a portion of three retirements—his, Chase's, and Mother's. Father wanted Chase to be financially independent because there was no certainty as to what kind of governmental resources would be available in the future. Father stated, however, that he would register Chase for Florida's public aid system but commented that his plan for Chase would not be dependent upon state-based services.

¶ 114 As for Chase's employment, Father opined that the focus at the current time should not be upon just getting Chase into any job available but upon developing Chase's skill sets and social aspects and raising Chase to the highest level that he was capable of in terms of making a living and quality of life. Father's employment goal for Chase, therefore, was to raise Chase's level of marketable skill sets to the highest level possible and to then integrate those to Chase's particular interest levels. In addition, Father pointed out that if he was guardian, he could provide Chase with flexibility in employment so that Chase could spend time with all of his family. With Chase's current employment, it was unclear whether Chase had the ability to take more than a few days off in a row.

¶ 115 When asked why he thought his plan was more appropriate for Chase in terms of Chase's best interest, Father stressed what he believed to be the strengths of his plan: financial resources, family supports, an open-minded team approach that included experts and advisors, abundant area resources, opportunities for development, and quality of life. In Father's opinion, his plan would provide Chase with the opportunity to be happy and independent and would allow Chase to live life to the fullest level of which he was capable. Father recognized that Chase's needs, wants, and desires were important but stated that Chase's best interest was more important.

¶ 116 Father's main concern with Mother's plan was that it appeared that Mother's plan had already been completed to the fullest extent possible in that Chase had already graduated, had a job, and was living at home. Now that there was an indication that Chase's job at Courtyard Estates was never going to be a full-time position, Father was not sure what would happen past that point under Mother's plan. Father stated that he had not heard anything in Mother's plan about adding any type of life skill sets or about Chase's development and potential. According to Father, that was the main difference between his and Mother's plans—his plan sought to determine where Chase could go and what Chase's potential was, and Mother's plan did not do so.

¶ 117 Father believed that Mother's plan involved Chase living at home for as long as she was able to take care of him because that was the only path that Mother could take, based upon her financial affidavit, since Mother needed to bring additional income into the home, regardless of whether that income was contributed from Father, the state, or from Chase. Father believed that the money was the reason that Mother was keeping Chase at home and not letting Chase develop or get closer to becoming as independent as possible. Father acknowledged, however, that Chase was not capable of living totally independently at that point.

¶ 118 In response to some of the specific negative claims that were made about him during some of the other testimony, Father stated that (1) he attended some of the visits with Dr. Chez in Chicago but scheduling became a problem because the visits were not being scheduled on a Monday or a Friday so that he could fly in from Florida; (2) pursuant to

certain restrictions in the parties' joint parenting agreement, he could not have Chase's condition evaluated or treated in Florida; (3) although Mother testified that he did not "dig in and help" her with Chase, she did not specifically request that he do anything in connection with Chase's physical condition or with his medical treatment during that period; (4) after he was remarried in 2006, he asked for more than two weeks of summer visitation with the children but was told by Mother that it would conflict with Kaitlin's activities and that he would have to discuss it directly with the children; (5) he exercised his phone visitation with the children over the years but many times when he called, there was no answer or the children's cell phones were turned off; (6) he never told the IEP team that he was absolutely adamant that Chase go to a four-year college but, rather, merely told them that it was his desire that someday Chase would develop to be able to do that; (7) his concern about the IEPs was that they planned only for an Illinois option; (8) while he and Chase were together in Florida over the past spring break, Chase did not express to him any of the feelings that were expressed in the notes that Chase had allegedly written;[4] (9) his discussions with Kaitlin about this case had been very limited, and she did not have all of the facts related to the issues involved in this case; and (10) although he had always been concerned about Chase's future, his plans in that regard escalated in January 2014 after he attended a conference on autism for the first time and saw how much hope there was for Chase. Father also described some of the problems that he had encountered with Mother over the years, including that (1) Mother had refused to allow the children to fly to Florida together without another adult going with them; (2) he had difficulty trying to set up a time through Mother for him to visit Chase in Illinois and with getting information from Mother about Chase's current job, even though he was a temporary coguardian of Chase at the time; (3) after he had given Kaitlin a copy of the GAL report and Dr. Cohen's report, he was threatened with litigation by Mother's attorney for supposed violations of the health care confidentiality laws; (4) after he had visited with officials at Chase's school and at Peoria Production in Spring 2014, his attorney received e-mails from Mother's attorney, objecting to him doing those things without Mother being present and claiming that he was trying to turn witnesses in this case; (5) Mother declined his invitation to come to Florida to visit the facilities that he had been talking about and to participate in Dr. Cohen's evaluation of Chase, even though he had offered to pay for Mother's airfare; (6) he was not notified of the date for Dr. Kurth's evaluation of Chase or provided with an opportunity to participate in that evaluation; and (7) he did not know until he had read the newspaper articles that the arrest of Mother's nephew on drug charges had occurred while the nephew was living in the other half of the duplex or that at the time of the robbery of Chase's grandfather, one of the subjects involved had been standing in the duplex with a shotgun.

¶ 119     According to Father, unlike the other issues between him and Mother, support issues were always worked out. Father paid regular child support to Mother for the children and also set up a joint bank account to which Mother had a debit card that Mother could use as a discretionary fund to pay for the children's ongoing medical bills or for extra expenses of the children. That account was still in existence. In addition to the discretionary fund and the direct child support, Father had been paying nearly 100% of the cost of Kaitlin's college

---

[4]Chase had also presented a note to his own attorney, which was similar to the one that he had presented to Dr. Kurth, about why he wanted to stay in Peoria with Mother.

education, outside of any scholarships and money that Kaitlin had earned on her own. Father had not taken Mother back to court to ask that Mother pay a percentage of those college costs. Furthermore, after the child support ended, Father continued to pay voluntary child support in a reduced amount of $500 per month. Father had determined the reduced amount based, in part, upon the assumption that Chase would be receiving $700 a month in SSI. Father acknowledged, however, that he was not sure what the requirements were for a person to receive SSI and that he continued to pay the same reduced amount, even though he had learned at the previous court date that some of his assumptions, upon which the reduced amount was based, were inaccurate.

¶ 120    A copy of the transcript of the court's prior *in camera* interview of Chase was offered into evidence by Chase's attorney for the court to consider as evidence in the trial. It was agreed that the transcript would not be shown to the parties. Chase's attorney represented that he was presenting the transcript in lieu of having Chase testify and that if Chase would have testified at the trial, he would have continued to express his preference to remain in Illinois with Mother as opposed to living in Florida with Father.

¶ 121    In her rebuttal case, Mother called Chase's sister, Kaitlin, back to the witness stand. Kaitlin testified, among other things, that (1) in the years that she and Chase were in high school, Father called them about once every six weeks; (2) she and Chase had never shut their cell phones off so that Father could not reach them, although Chase's phone did run out of power at times when he failed to charge it; and (3) she and Chase did not have much contact with their step-grandparents and had not received many gifts from them.

¶ 122    Mother also provided some additional testimony of her own in rebuttal. Mother stated, among other things, that (1) there were times when Chase's phone would be dead because he did not remember to charge the battery; and (2) she insisted that an adult accompany Kaitlin and Chase when they flew to Florida for safety reasons. During her rebuttal testimony, Mother also told her side of some of the situations that Father had described when he allegedly had problems setting up visitation, obtaining information, or getting Mother to come to Florida to see some of the available services. Mother also described what she had told Chase prior to Chase's appointment with Dr. Cohen. In addition, Mother commented that Chase was now attending the Focus program on Mondays and Wednesdays and that he had just become eligible to participate in the program during the past August when he had turned 19.

¶ 123    The GAL, Angela Evans, testified that she had spoken to both Mother and Father several times on the phone; had met with Chase and Kaitlin; had spoken with Father's current wife, Leigh, on the phone; had attended the depositions; had fact-checked the information provided by the parties; had reviewed the school and health records; and had been present for the testimony of the various witnesses at trial. It was Evans's opinion that Father would be the better guardian for Chase. Evans came to that conclusion because she believed that (1) Father was more likely to seek out and implement the advice of professionals with regard to what was best for Chase; (2) Father was better qualified to handle Chase's financial affairs and to make sure that Chase had financial independence; (3) with Father as guardian, Chase would not have to wait to be picked from the PUNS list before he could take advantage of the developmental resources that were available; (4) Father wanted to be guardian because he wanted to help Chase not because he was trying to get out of paying child support; (5) Father was more open to considering Mother's opinions and would encourage Mother to have input

into the decisions that were being made as to Chase; (6) Father was adamant that Mother be given a certain amount of time with Chase each year and would encourage family relationships; (7) there was less of a likelihood that Chase would regress in his social skills if Father was appointed guardian and Chase was living with Father; and (8) although Chase very clearly stated that he wanted Mother to make decisions for him and that he trusted her to do so, Father's plan was better for Chase in the long run because it would help ensure Chase's independence into the future when Mother and Father had passed away or were no longer able to care for Chase. Evans recommended, therefore, that Father be appointed the sole plenary guardian of Chase.

¶ 124      Evans acknowledged during her testimony that she only had met with Chase one time for about 15 minutes. Evans stated, however, that she did not feel that she needed to talk to Chase any further about the matter, especially when the experts in this case testified that Chase could not comprehend many different facts and could not accurately imagine the future. Evans acknowledged that Chase's position—that he wanted to stay in Peoria with Mother—had been consistent throughout this case. Evans's meeting with Kaitlin only lasted for about 15 minutes as well. Evans commented that her meeting with Kaitlin took place very early on in this case, that it was very traumatic for Kaitlin, and that Kaitlin was crying. Evans conceded that she had previously recommended before a different judge that Mother be appointed the sole guardian of Chase. Evans stated that a big part of why she was now recommending that Father be made guardian was because Father was more willing to put Chase in a group home, as the experts were recommending, and Mother was resistant to that idea. Evans believed that Mother was not taking into account what the professionals had stated was in Chase's best interest as far as the living situation for Chase. Evans acknowledged further that she had taken into account that Father had more money than Mother, that he could pay for the abundant services available in Florida, and that he did not have to rely on public aid but stated that was not the only reason why she was recommending that Father be appointed Chase's guardian.

¶ 125      During her testimony, Evans conceded that she had never presented a petition to the court for the payment of her fees in this case. Rather, Evans sent out monthly bills to the attorneys for Mother and Father. Those monthly bills were paid by Father. According to Evans, the fact of how her bill had been paid had not affected her decision in any way in this case. Evans agreed that she had accepted the payments from Father without first approaching the court and asking the court to approve her fees or to determine which of the parties should pay her fees. Evans did not agree, however, that doing so created the appearance of impropriety. Evans admitted that she had "plenty" of phone conversations with Father's attorney over the course of the case but did not know how many phone conversations that she had with Mother. Evans did not interview any of the school officials or Dr. Kurth but stated that she did attend Dr. Kurth's deposition and did ask some questions. Evans did not talk to the director of Courtyard Estates or to the person who was supervising Chase at that location.

¶ 126      Evans had filed her written report in November of the previous year. At that time, Father was indicating that he wanted Chase in a group home and Mother was indicating resistance to that. That was one of the reasons why Evans had recommended that Father be appointed guardian. Evans acknowledged that Father's position had since changed somewhat and that placement of Chase in a group home was now just one of the possible long-term options available for Chase. Evans commented that she thought Father's position was a

well-reasoned one and that it was consistent with the position of Dr. Kurth—that any possible transition would be dependent upon how Chase adapted and developed. Evans noted that Dr. Kurth's opinion was actually very similar to that of Dr. Cohen in that regard.

¶ 127    Evans denied that she was downgrading Mother because Mother was resistant to the idea of a group home or because Mother did not have the financial resources of Father and might need the assistance of public aid or of the Medicaid waiver program in order to provide services for Chase. Evans commented that all of the experts in this case—Dr. Halperin, Dr. Kurth, and Dr. Cohen—were essentially in agreement that Chase should be in some type of supervised or semi-independent living arrangement. Mother and her attorney were the only ones who were disagreeing with that, in Evans's opinion. According to Evans, there was not that much support in terms of services, programs, or resources for people with autism in Peoria. Evans was not aware, however, that the Antioch Center in Peoria had counseling for autistic adults or that Illinois State University had an autism center.

¶ 128    After all of the evidence had been presented and the attorneys had made their closing arguments, the trial court announced its ruling. The trial court's ruling and its detailed explanation thereof spanned approximately 30 pages of transcript. Early on in its ruling, the trial court explained the court's role in the process of selecting a guardian for a disabled adult under the Probate Act. The trial court indicated that in making its decision, it had to consider such things as (1) what the disabled adult would have intended had the disabled adult been competent to make the decision; (2) the respective qualifications of the proposed guardians; (3) the capabilities of the proposed guardians to provide an active and suitable program of guardianship; and, ultimately, (4) the best interest of the disabled adult.

¶ 129    The trial court had praise for both parents, commenting that it had two great, loving, and caring parents before it who were committed to doing what was in Chase's best interest, even though they could not agree on what that was. The trial court pointed out that both parents had safety concerns over where Chase would reside and that neither parent, therefore, could be critical of the other parent's safety concerns. The trial court commented that the incidents that had occurred at the adjoining unit to Mother's duplex were one-time incidents that were not likely to reoccur. The trial court went on to state that it thought that both parents would be extremely diligent in making certain that any place, whether it was a recreational day program or a residential program for the foreseeable future, was going to be safe for Chase.

¶ 130    Turning to the parties' plans for Chase, the trial court stated that both parents had done what they could to develop a life or transition plan for Chase. The trial court noted that there was a need for skill and developmental training; a need for monitoring Chase's mental and physical health; and a need to maintain Chase in a protective environment, where he would not be subjected to stresses, violence, or job requirements that he could not handle. The trial court stated further that it was sure that both parents were committed to the fact that Chase needed a skill set to go out and do whatever he was going to do and that there was a lot of agreement on those types of issues. However, according to the trial court, there was a divergence when it came to the experience of the parents with Chase. The trial court indicated that it had to separate out in this case what had happened because of the circumstances of the divorce and that it could not punish Father for living in Florida when that was where Mother and Father had lived initially and Mother had moved away. The trial court pointed out that because there were emotional issues involved in these types of cases, and not just financial issues or business decisions, there would always be some game playing

between the parties as to such things as child support, visitation, and twisting each other's words around.

¶ 131    Turning to the strengths of each parent in relation to serving as Chase's guardian, the trial court stated:

"Mother has committed her life and her career choice to meet Chase's needs. She has committed herself and her life and her time to study, to learn, to education [*sic*] herself and to educate others, and to create a network within which to help others, and to benefit from others' help and support. She has obviously taken an active and advocative life and role in Chase's education and his healthcare and his psychological adjustment, his vocational development, and advancing his life skills.

She has sought, found, and implements appropriate programs and activities within the limitations of Peoria. Could be worse. She could be in my hometown of 1,400 people, trying to find services for children or adults.

She has sought, found, and implements appropriate programming and activities, both social and recreational, as well as vocational and skill, educational. She has maintained constant and vigilant contact with multiple support professionals that are actually servicing or serving Chase's needs and all bent upon improving Chase's life and opportunities.

I would also echo, as the GAL did, that her efforts have been deemed the extraordinary, and I believe that she has developed a great deal of professional expertise, which combined with her professional or her own profession, advocation, vocation, have given her a broad spectrum of knowledge, not just about Chase, but about autism and about others similarly situated and those who are not similarly situated, so that she sees as comparative analysis and has a good working knowledge of the various levels of autistic ability and disability.

She has provided a home in which Chase has thrived, has been well-adjusted, has been well-nurtured by friends and family and teachers and service providers, educators.

He has done well in the areas of learning and gaining new life skills and creating a healthy lifestyle of exercise and recreation, as well as learning work ethic and understanding the dependence of others upon him, not just his dependence upon others.

Both parties can be proud of Chase's accomplishments. I said that the term of art of transition—applying just that. It's a term of art. You can call it anything you want, but as mother has testified, she is living Chase's transition plan. That is an important statement, and it came from, I'm sure, from the experience of being there and being part of Chase's development 24/7.

\*\*\*

There was discussion that mom hasn't pushed Chase to his fullest potential, and I believe that the evidence shows the contrary, even from preschool on, that she has pushed him towards preschool. She has pushed him towards being able to sit through kindergarten, through school, and in school, where others might retreat and say you know what, he's just not doing this. Let's home school, or let's go to a special school, or let's put him in a contained environment.

One of his pushed for advocative, for—and even had to go to bat against school officials for Chase's opportunity to be in an included classroom, and to have this important, necessary to make it happen, rather than to retreat. She has pushed him toward and obtained and made happen the opportunities for voluntary employment, for employment, and to make sure that every obstacle is overcome, rather than retreating from it.

Given that the parties share the goal to provide Chase to be as independent as possible, as independent as his abilities will allow as they grow, as he grows, I believe that the evidence is strong and supportive, and I find that the mother has pushed Chase to learn and to build upon these skills, introducing new challenges at a pace and in a manner best suited to Chase, and that's where the knowledge of the child or adult comes to, is knowing that pace.

Professionals can all give us as best theory as they know, but they all say too that each case is particular to the patient or to the client, and they don't give every single person that comes through the office the same shot. They won't give every person that comes through the office the same level of therapy or the same therapist. Everything has to be individually tailored, and they have to know as much as the parent in order to do that. They never will, but they give their best shot.

Ultimately, they have to rely on what the parent knows, and so I think it's reasonable for a parent to take into consideration all of the expertise that is given by as many people that can possibly be found that have knowledge in the area, but mom or dad, they have to make their own decisions.

    \*\*\*

So given the goals that both parents have for Chase, I think the mother has pushed to the right directions. I think she has pushed to the appropriate rate, speed, introducing things such as riding the bus, or paying bus fare, or making change at a speed that's appropriate to Chase.

Other factors that I've taken into consideration, not necessarily caused bind [*sic*], but simply circumstances of value, include Chase's home now, and also has the benefit of extended family, the adjoining half of the property, and immediate access to them and their support and love and kindness. I'm sure is beneficial to him.

He also has the benefit of his sister. In that relationship, things—good and strong relationship, and someone he can look up to, and he'll appreciate the support of in his home when she is there, or I think he probably still has that support when she's absent from the home, school, and as she moves on in life.

There was concern though that Chase spending too much time at this home could cause that caving or the regression. Of the GAL's suggestion, I don't recall it specifically, but the GAL's suggestion was that evidence was that this could happen very quickly, that the regression could happen immediately if he began this process or was left alone for lengthy periods.

And, in fact, in dad's closing, the same was suggested when we talked about how long he had been in the home before he was of age to participate in these other programs. He was working only part-time, so he was home, available to visit his

grandparents, but essentially home, and there has been no suggestion though from anybody that he has regressed, or that he has caved, or whatever the term may be.

So apparently, that isn't an issue. Why isn't it an issue? I think it's not an issue because of the level of activity that he has been provided, even in small-town America, to participate in social education, vocational and employment situations.

\*\*\*

I think there's also some benefit in having the routine schedule continue for him from what has been said by the experts that we've heard from. And finally, there's the benefits of status quo because we know that he's doing well. He's thriving.

\* \* \*

But there is a benefit in the status quo because we know it's working. We know it's got potential. We know he can build his potential. We know that there is a plan for his potential to be built upon, and it's not all about residence, but residence is part of that independence. It's necessary. All of his needs are being met. All of his potential is being tapped, and there are no holes being placed on it, his abilities, from what I can see.

Dad's plan is a great sell. It really is. There's magnificent, ninety-five slides, not one of which I wouldn't [*sic*] have omitted from that program. They're so beneficial. They threw everything out there, and they even found out which therapists like to ski or swim, and which don't.

I'm just happy to have all of that information if needed, but the real importance, the real meat of it is how many resources there are available, at least in Florida. I don't know about Illinois. I heard about Peoria. I didn't hear about Bloomington, or Champaign, or Chicago, or anywhere else. There are a lot of services available down there, and I wouldn't have known that without having had the benefit of dad's research on that. There are some practicalities to all of that, that need to be addressed.

First of all, those were all private paid. And particularly residentially ideas are all very expensive. As a practicality, I have two parties with income. Dad's got a pretty good income, but not enough to pay for that, for even one year, much less the rest of Chase's life. I don't know how rich the step-grandparents are, but they might be. I'll just assume for right now that they are indeterminably rich, that they have more resources than Fort Knox ever did, and that money is never ever going to be an object for them.

And giving that assumption, I still have no practicality in determining or accepting that they would pay out that kind of money forever, in fact, even beyond their own life expectancy to serve Chase for his life expectancy. And certainly, I have no jurisdiction to even ask for it. And the same with dad's wife, who is very supportive, and apparently has her own wealth and is willing, but I don't have any jurisdiction over that.

I have to look at the practicalities of these people living within their own means and Chase living within the means of his parents. I can't hope that he'll win the lotto once a week, or that Santa is going to visit every time the bill comes to the door. Not only does Chase have to be self-sufficient, but so do mom and dad. You can't hope to

be supported by someone else's generosity, anymore than Chase can, so what's that leave you with?

One-hundred and fifty thousand dollars a year is a great amount of money, at least here, maybe in Orlando, but it's not a terribly crazy amount of money, and people often go within their means. And in order to do that, there's going to have to be a reliance on public benefits for Chase, otherwise, Chase's welfare is only going to last as long as we last, as long as the parents last, and he's going to outlast us.

And for that matter, he's going to outlast our generation's earning capacity because people retire. People stop working. People's business can have ups and downs. There's no predictability to that, but there is predictability to public assistance, on which the general public has, I don't think for the worst, come to rely.

I think we have to have a subsidized program, especially for the disabled who can't earn their own way, and that gives more independence than relying upon dad's 37 percent of the business income or mom's income, hoping that their health continues, hoping that other bills don't get in the way. But the fact is public benefits are more predictable, longstanding. Of course, next time I say that, might be after the election I might have a different view, but so far, so good.

So I'm looking at the practicality of this, the practicality of dad's plan. The benefit is clear. There are a lot of services available, but the practicality is dependent on the kindness of strangers to me, and the kindness of family to him.

And as we talked about, all of the grandparents are in their seventies. I used to think that was old. Others might still say it is, and I can't make it [a] condition of guardianship that they support Chase.

I think it's impractical also to believe that Chase will thrive in a residential community in which everybody around him is higher functioning. It's not practical, and that's with all of the material that I've been given suggests of those programs that we're looking at.

There might also be programs that are more specific to Chase's needs and abilities, but I didn't get those yet. They might be available, but I don't know where they are. The literature from these programs is very telling, even though the individuals that dad has talked to have said oh, please bring your son by, and we want to meet him, and we want him in our program. We have six slots, and we've only filled four. There is a monetary necessity for all of these programs to have more bodies in them. And I'm sure that they would be willing to accommodate and to make provision for Chase, especially if it's private paid. That's just the way of [the] world. They'll do it, but I don't think it's necessarily the best placement just because they'll do it. It's very important for Chase to be in an environment that's protected and suited to him.

The experts that have been here, the job folks and educational folks who have said that the goal should be competitive employment, and the only competitive I've heard about is here and is working.

And whether it's part-time or full-time is not as important to me as whether it's here and it's working, and whether there are other services and activities and is

beneficial in the meanwhile because we're not talking about Chase ever being financially independent.

So, in fact, if he's working 10 hours, or 30 hours, or 40 hours is not really as important as that he's getting everything that he can from what he's doing, and that he is in a position that he feels great about what he is doing, and according to the witnesses, that it's competitive employment, as compared to subsidized employment or employment at home or at dad's place of work, or volunteer capacity.

It's a different experience, and it's a different work ethic, and it's—I'm all for volunteer work. I do a lot of volunteer work, but it's—it doesn't replace the need for sustainable competitive employment opportunities.

The plan also had information about the special needs trust, and I'm extremely familiar with the special needs trust, not only the pounders, but the five pagers that do what dad's talked about here is to protect the assets.

The real benefit of the special needs trust and from what I've read—I've read the entire trust. It is to protect the assets from not only—the trust part of it protects the assets from being absconded with or being lost to liabilities created by the disabled adult clearly, but the special needs part of it is that it's supplemented to public benefits.

* * *

A big part of what has happened here is, you know, mom has examined all of these issues and has gone to all of these lengths to create a living environment and opportunities for Chase's future over the long haul, and dad's plan by necessity of this litigation had to be developed in a very short amount of time. He spent tons of time on it, and all out of love for Chase, and it's a good thing, but it's all very concentrated in the last couple of months, some I think within the last few weeks.

The suggestion, one of those things that I have to discount is well, he hasn't had custody. He hasn't had Chase with him, but he still hasn't had custody. He still hasn't had Chase with him.

So apparently, all of the work that has been done for the last few weeks could have been done over a long period of time. Both parties had the ability and opportunities to anticipate that Chase would essentially [*sic*] be 18 years of age. That was no surprise to either one of you.

Mom spent her whole life planning for that and continues to. Dad began the effort late. I think it shows the level of commitment.

Another commitment issue I find is this financial aspect, and I'm not sure what to make of it, but I will take into consideration dad's suggestion, which is he's going to do this trust because Chase is going to be living with him. There is no requirement that dad can have this trust, whether Chase is living with him or not. Dad can have the exact same terms and the exact same funding of the trust, whether Chase is living with him or not.

If it's out of love, it will be exactly the same, so we'll find out just by waiting around whether that happens. If it was to buy Chase's guardianship, then it's contingent upon him coming to Florida, that it will only benefit his life if he comes to

Florida, but out of love, I'm sure that the intention is the same, whether he's in Florida or not.

I appreciated everything the GAL did in this case, and although my suggestions are different from hers, that doesn't discount the fact that the GAL's in a unique position to look objectively at the facts and to think about this in terms of the disabled adult's best interest.

I agree that being paid by one party versus the other and cutting one party out of the—out of the communication gives a bad appearance, but we're trained as lawyers. We're trained in ethics. We're training in independence, and I know that Ms. Evans knows the role of a GAL is to be independent, and I don't think she could have been bought.

I do think because of her level of communication with dad, that she gave greater credence to some of those plans that have been stated, but I don't find any unethical conduct. I do not want to sanction though, for the future, any billing by a GAL directly to one party or the other. The GAL works for the Court. Bills are submitted to the Court. The Court determines who pays the bill, and we have to maintain the independence of the GAL. In another circumstance, it could be disastrous not to do that.

One of the issues that the GAL addresses, very fair comment, and that is that the guardian, being the guardian of a person and estate of Chase, is going to have to account to the Court for every dollar that comes in, every dollar that comes out. And dad's financial background is extremely well-fitted to that.

It doesn't mean that others can't, but it is a responsibility that the parties need to address, and I appreciate the GAL bringing that up because you can't co-lingual [*sic*] funds unless specifically allowed by a Court. Some Courts do, so if he's getting SSI, many Courts, and I have been in many circumstances in the past but not all said well, you can take all of the SSI and use that for household expenses, and SSI allows you to account for it that way. But you have to account for any other income that he has and where it goes. I'm not addressing how that works just yet with the guardianship, but it is, as the GAL says, an absolute requirement of a person who's appointed guardian.

\*\*\*

The issue of visitation has been addressed because that's what we call it because of our usage in divorce cases, but in an adult world, it's not visitation. It's time with family, and I do hope that both parties understand the need to accommodate time with family.

I don't think it's practical to suggest that Chase could have competitive employment and take a summer off here or in Florida. I don't think it's practical, in fact, for Chase to even be in a group home and take a summer off, but maybe if it's self-funded, maybe you can get away with that and leaving half of a—leaving a bed in the group home unattended for months on end, but I'm not going to be in a position to determine when or how much time Chase spends with parents or grandparents or extended family. That is going to be within the discretion of the guardian appointed, and I said that at the outset, so that the parties knew that if they wanted to come to some agreement otherwise, that was the time to do it, but didn't.

And having now addressed all of those matters with regard to the guardianship plan and the capacity of each party, I would find independently, without reference to Chase's own desires, that [M]other would best serve as guardian of Chase. But I do look at what Chase told me. I have to say how proud the parents must be of him, and how incredibly communicative he was with me in the in camera conference.

I was amazed because of the introduction that I've had in the case that he was so talkative about his work and about what he does, about what he likes, what he doesn't like, about wanting to spend quality vacation time with dad in Florida, about wanting to live here and wanting to work here, enjoying his work and enjoying his life here, and all of the activities that he does participate in.

So with that additional overlay, I believe that I am appropriately taking into consideration the best interest, the respective abilities of the parties, and also the personal desires of the disabled adult and what the disabled adult would be saying.

The statute says if you weren't disabled, what you would say, but we know what he would say if he wasn't disabled because we know what he's saying if he's in his own abilities right now.

***

Where the disabled adult isn't comatose and is able to say exactly what he wants and has good reason for saying what he wants, that's helpful to a Court, and it was helpful to me.

Taking all of that into consideration, considering all of [the] evidence in the case, all of the exhibits that have been submitted and received, and taking into consideration the statutory criteria that we have dealt with here, it is the determination of the Court that the mother is awarded guardianship of Chase McHenry, plenary guardianship, as stated in person with power [to] place, but with the Court to determine and approve the ultimate placement that is found to be appropriate, with notice to father before that hearing occurs, sufficient notice, so that he can actually be here, preferably on a Monday or a Friday."

¶ 132    In November 2014, a hearing was held on a petition that Mother had filed for support from Father (petition for support of the parties' adult disabled child). The trial court had previously ordered, when it made its guardianship decision, that Father pay to Mother 20% of his net income as defined in section 505(a)(3) of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/505(a)(3) (West 2012)) as support for the parties' adult disabled child, Chase. The trial court later recognized that the section 505 (750 ILCS 5/505 (West 2012)) standard was not applicable in this case. At the conclusion of the hearing on the petition for support, the trial court found that it did not have enough information to make a ruling at that time. The trial court encouraged the parties to come to an agreement on the matter and told the parties that a further hearing would be held if the parties could not do so. The trial court referred the case to family court for any further proceedings that were necessary as to the payment of support by Father to Mother. Father later brought this appeal to challenge the trial court's guardianship decision.

¶ 133    While the case was on appeal, Father filed a motion in this court to supplement the record. We allowed that motion. One of the documents contained in the supplemental record was a copy of an article from a Peoria newspaper dated November 7, 2014, the date that

Father's notice of appeal happened to have been filed in this case. The article was about the retirement of the particular trial court judge that had made the guardianship decision in this case. The article noted, among other things, that the trial judge was retiring after 24 years on the bench, that he and his wife had two grown sons who lived on the East Coast, and that they also "had a profoundly disabled daughter who died several years ago."

ANALYSIS

I. Claim of Error in the Selection of Mother as Chase's Guardian

As his first point of contention on appeal, Father argues that the trial court erred in naming Mother as sole plenary guardian of Chase's person and estate, rather than Father. Father asserts that the trial court's ruling was against the manifest weight of the evidence and that it constituted an abuse of discretion. More specifically, Father claims that the trial court's ruling was erroneous in the following respects: (1) the trial court found that the crimes that had occurred at the grandparents side of the duplex were one-time occurrences that were not likely to reoccur, despite the fact that there was no testimony that the grandfather had stopped conducting business with strangers in the driveway or that the security measures at the duplex had been increased; (2) the trial court assumed that Mother would be taking advantage of resources for Chase that were available in Chicago, Bloomington, or other places around Peoria, even though Mother had never presented any evidence as to what those resources were, that she had sought them out, or that she would access those resources for Chase at any time in the future; (3) the trial court found that Mother had pushed Chase to learn, had excessive knowledge of Chase, knew the proper pace, and would take into consideration all possible resources and how to introduce them, despite the fact that Mother had not visited a group home in Peoria in the past 10 years, had initially told the GAL that she would not place Chase in a group home until she was no longer physically able to care for him, had refused to travel to Florida (even at Father's expense) to view the resources that were available there for Chase, was planning to keep Chase at home for the next five to seven years, had only started teaching Chase life skills within the past four months while the litigation was pending and after the GAL had recommended that Father be made sole guardian, had just pulled her plan for Chase (the transition toolkit) off of the internet about two weeks prior to her testimony, and had presented a plan to the trial court that offered no hope of Chase achieving even modest financial independence; (4) the trial court ignored the testimony of all of the expert witnesses in this case—that it was in Chase's best interest to be placed in an appropriate group home; (5) the trial court found that Father's plan was financially unrealistic by incorrectly focusing on one possible residential option in Father's plan, the immersive transition schools, despite the fact that the evidence had shown that the nonschool based residential placement facilities in Florida were substantially less expensive than they were in Illinois, that the cost of those facilities was only about $300 more per month than what Father had previously been paying in child support, and that Father could easily pay that amount based solely upon his own income; (6) the trial court found that Father's plan would place Chase in an environment with higher functioning adults, despite the fact that Dr. Cohen had testified that Chase could be placed in a group home in Florida with nearly exactly matched individuals; (7) the trial court implicitly found that Mother had the financial ability and was an appropriate person to be Chase's guardian, despite the fact that Mother was unable to explain the nearly $3000 gap between her income and expenses

each month, had not done any calculations as to what expenses were attributable to Chase, could not explain how she had attained the balances that she had in her accounts, would need approximately $2000 per month in support from Father just to make ends meet, had a large financial incentive to keep Chase in her home contrary to Chase's best interest, and lacked sufficient financial acumen to manage Chase's financial affairs; (8) the trial court ruled in Mother's favor despite the fact that Mother planned to keep Chase at home until she was no longer physically able to care for him and had a gross conflict of interest in that she needed the additional income that keeping Chase in her home would provide; (9) the trial court rejected Father's willingness to comport with the opinions of the expert witnesses in implementing his plan for Chase; (10) the trial court inexplicably held essentially that the experts in this case did not know anything and that Mother knew better than anyone else; (11) the trial court ignored that the resources available for Chase in Florida were far better than the resources available for Chase in the Peoria area; and (12) the trial court ignored Father's plan to make Chase not dependent upon public aid and doomed Chase to extreme poverty.[5] Based upon those alleged errors, Father asks that we reverse the trial court's ruling and that we either order that Father be named as the sole plenary guardian of Chase's person and estate or that we remand this case for a new trial.

¶ 137      Mother argues that the trial court's ruling was proper and should be affirmed. Mother asserts that in making its ruling, the trial court listened to three days of testimony from 13 witnesses, conducted an *in camera* examination of Chase, and considered all of the appropriate factors that apply under the law in making a guardianship decision. Thus, Mother contends that the trial court's ruling appointing her as Chase's guardian did not constitute an abuse of discretion. In addition, in response to some of Father's specific claims, Mother asserts that (1) she has no financial conflict of interest in this case and has filed a petition in the trial court to receive additional support from Father for Chase (petition for support of an adult disabled child); (2) she has already signed Chase up for the PUNS list in Illinois and will address the issue of residential placement for Chase when Chase's name is selected from the PUNS list for the potential receipt of services; (3) she has demonstrated that she has been considering Chase's future since the time that he was diagnosed, not only in terms of Chase's housing interests but also in terms of Chase's educational, social, and recreational interests; (4) Father makes his claims by picking and choosing from various points in the evidence presented at the trial, but in so doing, ignores the totality of all of the evidence presented; (5) the trial court balanced and weighed the evidence presented and decided what aspects of that evidence were important; (6) the record in this case shows that the trial court did not go outside of the evidence in making its decision and did not consider resources that were available for Chase outside of the Peoria area of which no evidence was presented; and (7) the GAL was biased in favor of Father from a very early point in this case and had previously recommended that Mother be Chase's plenary guardian. For all of the reasons stated, Mother asks that we affirm the trial court's ruling, naming her as the sole plenary guardian of Chase's person and estate.

¶ 138      Before we address the merits of the parties' arguments, we must first determine the appropriate standard of review to apply in this case on appeal. Father argues that the trial

---

[5]Father describes some of the alleged erroneous aspects of the trial court's ruling as being against the manifest weight of the evidence and others as being an abuse of discretion.

court's guardianship decision is subject to both an abuse of discretion standard of review and a manifest weight of the evidence standard of review. Thus, Father contends that the trial court's guardianship decision will be overturned only if the trial court abused its discretion or if the decision itself is against the manifest weight of the evidence. See *In re Estate of Green*, 359 Ill. App. 3d 730, 735 (2005); *In re Estate of Doyle*, 362 Ill. App. 3d 293 (2005)[6]; *In re Marriage of Russell*, 169 Ill. App. 3d 97, 103 (1988). Mother argues that the standard or review that applies in this case is the abuse of discretion standard (see 755 ILCS 5/11a-12(d) (West 2012); *Doyle*, 362 Ill. App. 3d at 303; *In re Schmidt*, 298 Ill. App. 3d 682, 690 (1998)) and that the additional component of manifest weight review only applies in those cases involving guardianship of a minor (see *Green*, 359 Ill. App. 3d at 735; *Russell*, 169 Ill. App. 3d at 102-03).

¶ 139    Having reviewed the statute and the case law on this issue, we agree with Mother that in cases involving guardianship of a disabled adult, the trial court's decision as to who to appoint as guardian is subject to an abuse of discretion standard of review on appeal. See 755 ILCS 5/11a-12(d) (West 2012); *Doyle*, 362 Ill. App. 3d at 303; *Schmidt*, 298 Ill. App. 3d at 690. Therefore, we will not reverse the trial court's decision to appoint Mother as Chase's guardian in the present case unless that decision constituted an abuse of discretion. See *Schmidt*, 298 Ill. App. 3d at 690. The threshold for finding an abuse of discretion is high one and will not be overcome unless it can be said that the trial court's ruling was arbitrary, fanciful, or unreasonable, or that no reasonable person would have taken the view adopted by the trial court. See *Blum v. Koster*, 235 Ill. 2d 21, 36 (2009); *In re Leona W.*, 228 Ill. 2d 439, 460 (2008); *People v. Illgen*, 145 Ill. 2d 353, 364 (1991).

¶ 140    Having determined the appropriate standard of review to be applied in this case, we now turn to the merits of the parties' arguments on appeal. Section 11a-3(a) of the Probate Act of 1975 provides that:

"Upon the filing of a petition by a reputable person or by the alleged disabled person himself or on its own motion, the court may adjudge a person to be a disabled person, but only if it has been demonstrated by clear and convincing evidence that the person is a disabled person as defined in Section 11a-2. If the court adjudges a person to be a disabled person, the court may appoint (1) a guardian of his person, if it has been demonstrated by clear and convincing evidence that because of his disability he lacks sufficient understanding or capacity to make or communicate responsible decisions concerning the care of his person, or (2) a guardian of his estate, if it has been demonstrated by clear and convincing evidence that because of his disability he is unable to manage his estate or financial affairs, or (3) a guardian of his person and of his estate." 755 ILCS 5/11a-3(a) (West 2012).

See also *In re Estate of Johnson*, 303 Ill. App. 3d 696, 704 (1999). A guardianship should be utilized only as is necessary to promote the well-being of the disabled person; to protect that person from neglect, exploitation, or abuse; and to encourage the development of that person's maximum self-reliance and independence. 755 ILCS 5/11a-3(b) (West 2012). In addition, a guardianship shall be ordered only to the extent made necessary by the disabled person's actual mental, physical, and adaptive limitations. *Id.*

---

[6]Father does not cite to a specific page in the *Doyle* decision.

¶ 141    The selection of a guardian for a disabled person shall be made in the discretion of the trial court. 755 ILCS 5/11a-12(d) (West 2012). To be qualified to serve, the proposed guardian must (1) be capable of providing an active and suitable program of guardianship for the disabled person; (2) be at least 18 years old; (3) be a resident of the United States; (4) be of sound mind; and (5) generally not be convicted of a felony.[7] 755 ILCS 5/11a-5(a) (West 2012); *Johnson*, 303 Ill. App. 3d at 704-05. In selecting the appropriate guardian, the trial court shall give due consideration to the preference of the disabled person but is not bound by that preference. 755 ILCS 5/11a-12(d) (West 2012); *Johnson*, 303 Ill. App. 3d at 705; *Schmidt*, 298 Ill. App. 3d at 689. The trial court must also consider the qualifications of the proposed guardian. 755 ILCS 5/11a-12(d) (West 2012); *Schmidt*, 298 Ill. App. 3d at 689. The primary consideration, however, in selecting a guardian for a disabled person is the best interest and well-being of the disabled person. *Johnson*, 303 Ill. App. 3d at 705; *Schmidt*, 298 Ill. App. 3d at 690. Some of the factors that the trial court may consider in making that determination include (1) the degree of relationship between the disabled person and the proposed guardian; (2) the recommendations of persons with kinship or familial ties to the disabled person; (3) conduct by the disabled person prior to the adjudication demonstrating trust or confidence in the proposed guardian; (4) prior conduct by the proposed guardian indicating a concern for the well-being of the disabled person; (5) the ability of the proposed guardian to manage the disabled person's estate (the proposed guardian's business experience and other factors); and (6) the extent to which the proposed guardian is committed to discharging any responsibilities which might conflict with his or her duties as a guardian. *Johnson*, 303 Ill. App. 3d at 705; *Schmidt*, 298 Ill. App. 3d at 690.

¶ 142    In the present case, after having reviewed the record thoroughly, we find that the trial court did not err in appointing Mother as Chase's guardian, rather than Father. Mother had been thoroughly committed to every aspect of Chase's well-being since the time that Chase had been diagnosed. She had taken extensive steps to educate herself about Chase's condition and to advocate for Chase's needs. She had taken it upon herself to find a doctor who could determine whether Chase was having seizures when he was very young; had implemented a behavior and learning program at home for Chase after having sought aides and funding to do so; had sought to make sure that the school followed and reinforced that behavior program; had constantly monitored Chase's progress and made any changes that were necessary; and had been active in helping Chase obtain suitable employment skills, in helping Chase maintain successful employment, and in teaching Chase life skills. As the trial court noted, Mother had been living the transition plan for Chase's entire life and had been successful in doing so. Chase was happy living in Peoria with Mother, wanted to stay in that location, and did not want to move to Florida. He was also happy in his current employment position and was well liked by his employer, the residents of the facility, and his fellow employees. It is clear from the trial court's ruling that the trial court knew the applicable law, weighed the appropriate factors, and came to a decision based solely upon the evidence presented after weighing that evidence in relation to Chase's best interest. Upon reaching its decision, the trial court thoroughly explained the reasons for that decision on the record. Based upon the circumstances presented in the instant case, we find that the trial court did

_____

[7]The statute does, however, contain an exception that allows a person who has been convicted of a felony to serve as guardian under certain circumstances.

not commit an abuse of discretion in appointing Mother to serve as Chase's guardian. See *Blum*, 235 Ill. 2d at 36; *Leona W.*, 228 Ill. 2d at 460; *Illgen*, 145 Ill. 2d at 364.

¶ 143    In reaching that conclusion, we note that we do not agree with Father's claims that the trial court considered matters outside of the record in making its decision and that the trial court's findings were inconsistent and unsupported by the evidence. Our review of the record indicates to the contrary. The trial court in the present case was faced with the difficult task of determining which one of Chase's parents should serve as Chase's guardian. Each parent was well qualified to serve in that capacity, and each parent had a plan for Chase's future that he or she believed was in Chase's best interest. The trial court considered the appropriate factors under the law, weighed the evidence presented, and came to a thorough and well-reasoned decision. We simply cannot find in the instant case that the trial court's ruling was arbitrary, fanciful, or unreasonable, or that no reasonable person would have taken the view adopted by the trial court, as we would be required to conclude in order to find that an abuse of discretion had occurred.

¶ 144                            II. Claim of Judicial Bias or Prejudice

¶ 145    As his second point of contention on appeal, Father argues that the trial court's ruling should be reversed because of an alleged personal undisclosed prejudice of the trial judge. In support of that position, Father claims that (1) at some point after the ruling in this case, he learned through a newspaper article regarding the trial judge's retirement that the trial judge had a disabled adult daughter who had been raised at home and who had died only a few years prior to the hearing in this case; (2) the trial judge's personal circumstances were nearly identical to that of Mother and her stated intent to keep her disabled adult son at home for as long as she was able to care for him; (3) had the trial judge disclosed that information in this case, Father would have sought to substitute the trial judge; (4) the trial judge's failure to disclose that information deprived Father of his right to substitute judge; (5) comments made by the trial judge during his ruling in this case show a great affinity for Mother's position for raising the disabled adult in her home and a great animosity for Father's position; (6) the trial judge's bias led the trial judge to ignore the comparative lack of resources in Peoria as compared to Florida, to unilaterally reject all of the doctors' opinions in this case, and to ignore or misconstrue the evidence regarding Father's financial advantage and his ability to pay for the possible residential placement of Chase in Florida; and (7) the trial judge's ruling both implicitly and explicitly revealed the trial judge's prejudice against transitioning a disabled adult to a larger community with more resources. For the reasons stated, Father asserts that there was clear evidence of judicial prejudice in this case and asks that we reverse the trial court's ruling.

¶ 146    Mother argues that there is no indication of any judicial bias in this case and that the trial judge's ruling should be affirmed. In support of that argument, Mother asserts that (1) contrary to Father's claim, the newspaper article in question did not state that the trial judge's disabled daughter was raised at home; (2) Father tries to use that "made-up" fact to mislead this court into finding that the trial judge was prejudiced in favor of Mother and against Father; (3) at no time during the bench trial or the ruling in this case did the trial judge allude to his own personal circumstances, other than one comment that the trial judge made about his home town of 1400 people; (4) without that "made-up" fact, Father has nothing to assert that the trial judge's personal circumstances were nearly identical to that of Mother and to

her stated intent to keep her disabled son at home; (5) all that is known in this particular instance is that the trial judge had a profoundly disabled daughter who died—it is not known the kind of disability the daughter had, where the daughter resided, or how old the daughter was when she died; and (6) the mere fact that the trial judge had a disabled child is not evidence of judicial bias in any way. In addition, Mother also contests the claims that Father makes regarding the specific ways that the trial judge's bias allegedly manifested itself in this case. First, as to Father's claim that the trial judge ignored the comparatively greater amount of resources for Chase in Father's central Florida area, Mother contends that the trial judge did not ignore that evidence. Rather, Mother submits, the trial judge acknowledged that Father had presented evidence to that effect but went on to point out some practical concerns that he had with those resources, such as the court's inability to order others to help pay for those resources, the lack of evidence presented as to programs in Florida that were more specific to Chase's individual needs and abilities, the need for public benefits for Chase, and the ability of Chase to have competitive employment in Florida. Second, as to Father's claim that the trial judge ignored the opinions of the doctors in this case, Mother contends that there is no indication in the record that the trial judge ignored those opinions. Rather, according to Mother, the trial judge made the very valid point that experts could give their opinions, but it was the parent or guardian who was responsible for actually making the decision for their child or ward. In addition, Mother points out, Father's own expert testified in this case that her report was substantially the same as the report of Mother's expert. The only difference was that the two experts disagreed as to what extent Chase could eventually attain semi-independent living. Third and finally, as to Father's claim that the trial judge ignored or misconstrued the evidence of Father's financial advantage, Mother contends that this is really the crux of Father's entire argument—that no reasonable person could ever believe that Chase would be more appropriately served by having Mother act as guardian, rather than the wealthier Father. According to Mother, the trial court addressed that issue by summarizing at length the level of commitment that Mother had demonstrated for Chase over the years since the time that Chase had been diagnosed. For all of the reasons set forth, Mother asks that we reject Father's claim of judicial bias and that we affirm the trial court's ruling in this case.

¶ 147     The Code of Judicial Conduct provides, among other things, that (1) a judge is obligated to avoid both impropriety and the appearance of impropriety and should not allow his family, social, or other relationships to influence his judicial conduct or judgment (Ill. S. Ct. R. 62 (eff. Oct. 15, 1993)); (2) a judge shall perform the duties of his office impartially and diligently and without any bias or prejudice (Ill. S. Ct. R. 63 (eff. July 1, 2013)); and (3) a judge shall disqualify himself in a proceeding where his impartiality might reasonably be questioned, including but not limited to instances where he has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding (Ill. S. Ct. R. 63 (eff. July 1, 2013)). Trial judges are presumed to be both fair and impartial. See *Eychaner v. Gross*, 202 Ill. 2d 228, 280 (2002); *Calabrese v. Benitez*, 2015 IL App (3d) 130827, ¶ 25; *Lesher v. Trent*, 407 Ill. App. 3d 1170, 1176 (2011). The party claiming that a trial judge is prejudiced bears the burden of overcoming that presumption. *Eychaner*, 202 Ill. 2d at 280. Adverse rulings alone are almost never sufficient to support a claim of judicial bias, even if those rulings are alleged to be erroneous. *Id.* The party claiming judicial bias must show that the judge in question had (1) a personal bias stemming from some source other than the litigation; or (2) made comments in the course of

the proceedings that revealed such a high degree of favoritism or antagonism on the part of the judge as to make fair judgment impossible. See *id.* at 280-81; *Lesher*, 407 Ill. App. 3d at 1176.

¶ 148 In the present case, we have reviewed the record thoroughly and have found no indication that the trial judge was prejudiced or biased in any manner. The newspaper article and the statements made by the trial judge in explaining his ruling, which Father points to as evidence of the trial judge's bias in this case, do not show such a high degree of favoritism or antagonism on the part of the trial judge as to make a fair judgment in this case impossible, nor do they establish an outside source of bias as Father suggests. See *Eychaner*, 202 Ill. 2d at 280-81; *Lesher*, 407 Ill. App. 3d at 1176. The newspaper article indicated only that the trial judge and his wife had a profoundly disabled daughter who had passed away at some point. The article did not state the nature of the daughter's disability, how old the daughter was when she passed away, or whether the daughter had resided at home. Thus, contrary to Father's assertion on appeal, the newspaper article did not establish that Father's personal situation with his own disabled daughter was nearly identical to Mother's situation with her disabled adult son. By the same token, the few statements that Father points to in the trial court's lengthy decision do not establish whether the trial judge was speaking from his personal experiences with his own disabled daughter, from his life experiences, or from his experiences as a trial judge for over 20 years. At any rate, a trial judge may consider the evidence presented at trial in the light of his own observations and experience in life. *People v. Tye*, 141 Ill. 2d 1, 25 (1990). The background and experience of a trial judge are disqualifying only if they prevent that judge from assessing the evidence fairly and impartially. *Id.* It is assumed that a trial judge, regardless of his own personal backgrounds and experiences in life, will be able to set aside any biases or predispositions he might have and consider each case in light of the evidence presented. *Id.* We find no indication that the trial judge failed to do that in the present case. Therefore, we reject Father's claim of judicial bias. See *Eychaner*, 202 Ill. 2d at 280-81; *Lesher*, 407 Ill. App. 3d at 1176; *Tye*, 141 Ill. 2d at 25.

¶ 149                    III. Claim of Error in the Amount of Initial Support Set by the Trial Court

¶ 150 As a final point of contention on appeal, Father challenges the amount of initial support that was set by the trial court. As acknowledged by Father, however, the support order is not a final order, which is subject to appeal. In addition, at this time, the support order is not part of an appeal on the guardianship issue as provided for in Illinois Supreme Court Rule 304(b)(1) (eff. Mar. 8, 2016). Since the support issue is still before the trial court and will be resolved by the trial court's family division when it rules upon Mother's motion for support (motion for support for an adult disabled child), it would be premature for us to rule upon that issue at this time.

¶ 151                                   CONCLUSION

¶ 152 For the foregoing reasons, we affirm the judgment of the circuit court of Peoria County.

¶ 153 Affirmed.

¶ 154 JUSTICE SCHMIDT, specially concurring.

- 46 -

¶ 155 I concur in the judgment.