**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 220021-U

Order filed February 7, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| *In re* THE ESTATE OF ANTHONY L. ARBOLEDA, | ) ) ) | Appeal from the Circuit Court of the 18th Judicial Circuit, DuPage County, Illinois, |
| an Alleged Disabled Person | ) ) | |
| (Nelly Arboleda Frausto, | ) ) | |
| Petitioner-Appellant, | ) ) | Appeal No. 3-22-0021 Circuit Nos. 20-P-522, 20-P-532 |
| v. | ) ) | |
| Sandra Patricia Lopez and Anthony L. Arboleda, | ) ) ) | Honorable James D. Orel, |
| Respondents-Appellees). | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE HOLDRIDGE delivered the judgment of the court.
Justices Hettel and McDade concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:   The trial court did not err in amending the order granting the petitioner sister plenary guardianship and subsequently awarding plenary guardianship to the respondent wife.

¶ 2    The petitioner, Nelly Arboleda Frausto, filed an action seeking guardianship over her brother, Anthony L. Arboleda. Anthony's wife, the respondent Sandra Patricia Lopez, filed a

competing action. While originally awarding plenary guardianship to Nelly, the court amended its order, giving Nelly temporary guardianship. The court ultimately named Sandra as Anthony's plenary guardian. Nelly appeals, arguing that the court erred in amending the order awarding her plenary guardianship and ultimately awarding plenary guardianship to Sandra.

¶ 3                                    I. BACKGROUND

¶ 4        In June 2020, Nelly filed an emergency petition for appointment of guardianship for 60-year-old Anthony, based on Anthony's diagnosis of Alzheimer's. Anthony was living with Nelly at the time. The court found that the matter was not an emergency and ordered Nelly to serve Anthony and Sandra. Sandra also filed a petition for appointment of guardianship for Anthony, and the two cases were consolidated. A guardian *ad litem* (GAL) was appointed, conducted interviews, and issued a report. Anthony was interviewed with Nelly present. The GAL stated that Anthony only spoke about 10 words to him the entire 3 hours he was there. When he asked Anthony questions, Anthony "always seemed to be seeking clues from" Nelly and his other sisters. Sometimes the sisters would speak to Anthony in Spanish before he would answer. The GAL did not speak Spanish so he could not understand what was said. Anthony communicated that he needed a guardian and wanted Nelly to be his guardian as she treated him well and Sandra did not. When he interviewed Nelly, she made significant accusations against Sandra, including, *inter alia*, that Sandra tricked Anthony into marrying her, threw Anthony's medicine away, would only feed Anthony leftover food, and was stealing money from Anthony. The GAL spoke with a caseworker at DuPage County Protective Services. She stated that two complaints were filed with her agency concerning Anthony. She spoke with Anthony twice on the phone and each time Nelly was present and continuously interrupted her conversation with Anthony or sought to paraphrase her questions to Anthony. When the GAL spoke to Sandra, she denied the allegations against her. She stated that

she and her husband had always had a loving relationship, and she was desperate to have him home so she could care for him. She tried daily to call or text Anthony to no avail. Neither she nor their minor son had seen or spoken to Anthony in almost four months.

¶ 5        The GAL concluded that Anthony needed a guardian, but he was not convinced that everyone was solely concerned about Anthony's best interests. He stated that the allegations against Sandra were troublesome, and the alleged conduct would be unacceptable if it were true. He stated that he doubted "that the allegations [were] remotely close to reality," but were instead "grossly exaggerated and blown out of proportion to make [Sandra] appear badly." He stated that Sandra struck him as a person who sincerely loved Anthony and cared for his welfare. The GAL stated:

> "On the other hand, the sisters may have another agenda. They claim that they are only interested in caring for their brother. I suppose I could be wrong, but I think there is much more to this. They apparently had not been involved in their brother's life very much until the end of last year. Suddenly, they have taken over his life and may be controlling him. It seemed to me that their dislike of Sandra and their lack of trust in, and respect for, her are the major force[s] guiding them. They seem to be genuinely caring for Anthony, but everything they do and say seemed to be negatively colored by their feelings toward Sandra."

The GAL stated that, given Anthony's responses to his questions, it would seem he should stay with Nelly. However, the GAL said that he did not know whether Anthony understood the questions "and, if so, whether he was responding for himself or simply parroting what he had been taught." The GAL suggested that Anthony speak to a Spanish-speaking psychologist before the

court made a final decision. Anthony's attorney believed that Nelly should be appointed as guardian as she had more support, and Sandra did not drive or speak English.

¶ 6    A hearing was held on April 20 and 21, 2021, where many witnesses testified. At the conclusion of the hearing, the court stated that it would reconvene on April 26 with its decision. The court appointed Nelly as guardian of the person and the estate. He further ordered that the estate should pay for the marital home (where Sandra and their minor child resided), the real estate taxes, insurance, and 50% of the utilities. The court ordered visitation for both Sandra and their minor child once during the week and alternating weekends. The court stated that the GAL would create a report for the court after three months to reevaluate. The court said:

> "I will say to all sides, this was a very difficult decision, because I believe [Sandra] and [Nelly] both love and care for [Anthony], and there's a marriage involved here and there's a young child involved here. And you're asking the Court to make a very serious, very, very serious determination and *** I did consider everything and I think this is the best for now. *** I'm not going to make it permanent. I'm saying it's permanent, but I'm going to revisit it. So I think it's very important that this family *** attempt to be reunited with visitation, and we'll see how the parties work together."

Nelly then stated, "Excuse me. I have serious concerns about that." The court asked whether this was a motion to reconsider its ruling. The record does not show that Nelly responded to this question. The court stated that it was considering Nelly's statement as an oral motion to reconsider its ruling. The court explained, "Then maybe this won't work, because as soon as I've given the order now you're telling me it's not going to work. So maybe *** I will reconsider my ruling based on what just happened here." The court told Nelly to let her attorney speak for her. The court

4

waited for Nelly's attorney to appear via Zoom, but when he did not, the court stated that it would hear arguments on Nelly's oral motion to reconsider the following day. The court stated that the written order should state, "I gave guardianship to [Nelly], both of the person and the estate and she objected to it. So I took that as an oral motion to reconsider which I will be hearing tomorrow morning."

¶ 7       The parties met the following morning for the motion to reconsider. Nelly's counsel stated that Nelly "was afraid that if [Anthony] went for long periods of time to the marital residence, he wouldn't get his medication, he wouldn't be fed in time." Counsel stated that he did not want the court's ruling reconsidered. The court stated that counsel was not present the previous day so Nelly "was stepping up on her own behalf." The court stated that Nelly's outburst made it concerned that Nelly would not follow the court's orders. The court stated that it was going to change its ruling from a plenary guardianship to a temporary guardianship for 90 days, since, based on Nelly's outburst, it did not believe that the terms of the guardianship would work. The court stated that it would take the GAL's suggestion and have Anthony meet with a Spanish-speaking psychologist.

¶ 8       The GAL issued another report on August 16, 2021. The report stated that originally Nelly did not comply with the visitation schedule until the GAL brought the matter to Nelly's attorney. The report stated that the GAL had visited Anthony at his home with Sandra and their son twice. During both visits, Anthony's reaction to Sandra was dramatically different from the last time the GAL had seen him. Anthony was smiling constantly, maintained hold of Sandra's hand, and appeared happy. Sandra showed the GAL some videos of Anthony coming and going from the home. He appeared quite happy to arrive and showed his displeasure at having to leave. Sandra reported some issues with Nelly's cooperation, including delivering Anthony to the home with soiled diapers and refusing to provide information regarding the medication or food Anthony had

5

consumed before arrival. The GAL stated that he attempted to visit Anthony at Nelly's house several times and was only invited inside once. Nelly stated that Anthony cried frequently after returning from visitations and would not tell her what was wrong. Nelly opined that he was unhappy that he had to visit Sandra. During the visit with Nelly, the GAL observed Anthony was not smiling and had a sad look on his face. When the GAL asked if Anthony wanted to remain with Nelly or live with Sandra, he said Sandra with a smile on his face. The GAL noted that Sandra had completed a driving course to better care for Anthony. She only needed to take the driving test to become licensed. In order to do so, she needed to have access to an insured vehicle. The GAL noted that Nelly had control over Anthony's cars and cancelled the insurance on them. Sandra was also beginning a formal course to improve her English. The GAL recommended that guardianship be transferred to Sandra.

¶ 9        The case proceeded to a guardianship hearing on September 30, 2021. The attorneys requested a meeting with the judge to discuss reaching a settlement, but Nelly would not agree to settlement discussions. Sandra testified that she was able to care for Anthony's medical and financial needs. She had learned to drive and took the guardianship training course. Sandra had a degree in accounting, but she planned on taking care of Anthony and their child full time. The GAL testified consistent with his recent report, stating that he believed Sandra should be named Anthony's guardian. The GAL stated that the previous weekend he received a call and an email from Eddie Garcia stating:

> "Nelly was up to her tricks, that the police were called; and she was trying to get Anthony to refuse to go to Sandra's house, as was the custom the last few months, to spend the weekend.

I learned that the police weren't called to Sandra's home—or to Nelly's home, but *** in fact, Nelly drove Anthony almost to Sandra's home. She stopped on the corner a couple of blocks away and called the police there. The police came. *** From what I heard, she told the police that he did not want to go to Sandra's house. The police asked him whether he wanted to go to Sandra's house. He said, yes, he did. So then the police told her to take him to Sandra's house."

The GAL stated that this situation confirmed what he had been thinking about the case, stating:

"I don't mean to be too accusatory, but *** I think that Nelly is trying to paint Sandra as a bad person and trying to create problems here rather than trying to help Anthony. Everything that comes from Nelly is negative about Sandra, and I don't see any of that with Sandra. I think Sandra's got Anthony's best interest at heart, and I don't see that way from the other side at all."

The GAL stated that Sandra's English had improved, and that he thought she was more than capable of taking care of Anthony.

¶ 10 Eddie Garcia testified that he had been Anthony's good friend for approximately 10 years, and their wives were sisters. Anthony had met Sandra when visiting Eddie. Eddie stated that he and his wife often helped Sandra and Anthony. As Sandra did not have a license, Eddie would drive Anthony back to Nelly's house. He struggled to get Anthony in the car because Anthony did not want to go back. With Sandra, Eddie stated that Anthony was a very happy person, and Sandra was able to care for him. Eddie said that, from the time he met Anthony, Anthony's relationship with Nelly had always been "stressed."

¶ 11 Anthony's sister, Angelica Arboleda Robles, testified that she had been living with Nelly and helping to care for Anthony. Nelly took Anthony to all of his medical appointments and fed

7

him well, and Anthony seemed happy with them. Angelica stated that many times Anthony did not want to go to Sandra's, but Nelly made him as it was court ordered, which is what had happened the previous weekend when Nelly called the police. She stated that when Anthony would come back from Sandra's he looked "[t]erribly wrong" and like he had not slept. Angelica said that, when she went to their home in 2019, Sandra was aggressive and "would yell at [Anthony] like an animal."

¶ 12 Nelly testified that she worked as a paralegal for the Department of Justice, but when she was not home, Angelica would care for Anthony. She stated that she and Sandra did not get along, but she made Anthony go to his visits, even when he did not want to. Nelly stated that Anthony originally asked if he could stay with Nelly. Nelly stated that she takes Anthony to his appointments and described in length how she cared for him. Anthony never told Nelly that he did not want to live with her. She stated that while it was difficult to care for Anthony, she believed it was in his best interest that she and her sister care for him.

¶ 13 The case was set for decision on October 5. The court awarded temporary guardianship to Sandra, noting that it wanted the GAL to do a couple more visits. Should the temporary guardianship work out, the court stated that it would make it a plenary guardianship. The case was thus set for December. Nelly moved to stay the temporary guardianship, but the court denied the motion.

¶ 14 Prior to the plenary guardianship hearing, the GAL issued a report. The report stated that he had visited Anthony and Sandra three times, two of which were unannounced. Anthony seemed happy, and they had made improvements to the house to accommodate Anthony's needs. Anthony was taken to all of his appointments, and Sandra was taking care of the finances. When asked if he wanted to go back to Nelly's home, Anthony shook his head and "seemed genuinely upset by

8

[the] question." The GAL recommended that Anthony remain with Sandra, as he appeared much happier, and Sandra was more than capable of caring for him. After arguments and the recommendation from the GAL, Sandra was appointed plenary guardian. Nelly appealed.

¶ 15                                    II. ANALYSIS

¶ 16        On appeal, Nelly argues that the court erred in (1) construing her outburst as a motion to reconsider, (2) amending its order to grant her temporary guardianship instead of plenary, and (3) ultimately awarding plenary guardianship to Sandra.

¶ 17        At the outset, Sandra has filed a motion to dismiss challenging this court's jurisdiction. In doing so, Sandra argues that Nelly was required to file an interlocutory appeal under Illinois Supreme Court Rule 304(b)(1) (eff. Mar. 8, 2016) in April 2021, as she is challenging, in part, the court's April 2021 ruling. Rule 304(b)(1) states that a person may take an interlocutory appeal without any special language by the judge saying there is no just reason for delay if the judgment or order is "entered in the administration of an estate, guardianship, or similar proceeding which finally determines a right or status of a party." Assuming that this issue was eligible for interlocutory appeal, our supreme court has held that the failure to pursue an immediate interlocutory appeal does not forfeit the right to challenge the interlocutory order upon entry of final judgment. See *Salsitz v. Kreiss*, 198 Ill. 2d 1, 11-12 (2001). Therefore, we deny the motion to dismiss and find that we have jurisdiction to consider Nelly's arguments.  While Sandra did not file an appellee's brief in this case, we will consider Nelly's arguments as the record is simple and the claimed errors are such that the court can decide them without the aid of an appellee's brief. *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976).

¶ 18        Before reaching the merits, we note that Nelly makes multiple factual assertions/allegations in her brief that are not supported by the record and includes documents in her appendix which are

not included in the record on appeal. We will not consider these assertions or documents. See *In re Marriage of Pavlovich*, 2019 IL App (1st) 172859, ¶ 14 ("To the extent that documents or allegations relied on *** are not contained in or supported by the record on appeal, we will disregard them in addressing [the] contentions on appeal."); *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984) ("Any doubts which may arise from the incompleteness of the record will be resolved against the appellant."); *Kensington's Wine Auctioneers & Brokers, Inc. v. John Hart Fine Wine, Ltd.*, 392 Ill. App. 3d 1, 14 (2009) ("An appellate court may not consider documents that are not part of the certified record on appeal.").

¶ 19    First, Nelly argues that the court erred in construing her outburst as a motion to reconsider its judgment. Nelly cites no caselaw that stands for this proposition. We find that the court could reasonably construe Nelly's statement as a motion to reconsider. See, e.g., *People v. Todd*, 249 Ill. App. 3d 835, 840 (1993) (discussing construing an oral statement as a motion for a new trial); *Savage v. Mui Pho*, 312 Ill. App. 3d 553, 559 (2000) (the character of a motion should be determined from its content); *Pasquinelli v. Sodexo, Inc.*, 2021 IL App (1st) 200851, ¶ 27 (same). After the court gave its oral ruling, Nelly made known her issues with the court's decision. The court asked if she was making a motion to reconsider. According to the transcripts, Nelly did not reply.[1] The court then stated that it would consider her statement as a motion to reconsider. Based on Nelly's comment, the court could have reasonably construed that Nelly was requesting that the court reconsider its ruling.

¶ 20    Second, Nelly argues that the court erred in amending its order to give Nelly temporary guardianship, instead of plenary guardianship. In this case, such amounted to a distinction without

---

[1]Nelly's brief states that she specifically denied that she was making an oral motion to reconsider. After reviewing the transcripts, we note that this was not the case.

a difference. Even when awarding Nelly plenary guardianship, it stated that the guardianship would not be permanent, it would continue to monitor the case, it would revisit its decision in three months, and it sought to, in the future, reunite Anthony with his wife and child in the family home. Moreover, Nelly cites no case law for her proposition, and our research uncovered no case law in which it has been found that a court has erred by giving temporary guardianship instead of plenary guardianship. We cannot say that the court erred.

¶ 21　　　Last, Nelly argues that the court erred in awarding Sandra plenary guardianship. "[I]n cases involving guardianship of a disabled adult, the trial court's decision as to who to appoint as guardian is subject to an abuse of discretion standard of review on appeal." *In re Estate of McHenry*, 2016 IL App (3d) 140913, ¶ 139. Therefore, we will not reverse the trial court's decision unless it was arbitrary, fanciful, or unreasonable, or no reasonable person would have taken the view adopted by the trial court. *Id.* In selecting an appropriate guardian, the court must consider the preference of the disabled person and the qualifications of the proposed guardian. *Id.* ¶ 141; 755 ILCS 5/11a-12(d) (West 2020). The primary consideration is the best interest and well-being of the disabled person. *Estate of McHenry*, 2016 IL App (3d) 140913, ¶ 141. In determining the best interests, the court may consider, *inter alia*: (1) the recommendations of the family, (2) the relationship between the disabled person and the potential guardian, (3) conduct by the disabled person which shows trust or confidence in the proposed guardian, (4) prior actions of the proposed guardian that indicate concern for the disabled person's well-being, (5) the ability of the proposed guardian, and (6) the extent to which the proposed guardian is committed to discharging responsibilities which might conflict with his or her duties as guardian. *In re Estate of Johnson*, 303 Ill. App. 3d 696, 705 (1999).

¶ 22 Here, after thoroughly reviewing the record, we find that the trial court did not abuse its discretion in appointing Sandra as Anthony's guardian. Anthony told the GAL that he wanted to live with Sandra, and the GAL recommended that Sandra be named the guardian. The evidence showed that Sandra was equipped to care for Anthony. She had taken steps to increase her abilities to care for him, including learning to drive, improving her English, and making handicap accessibility improvements to the marital home. Moreover, the GAL, an uninterested party, had concerns about Nelly. It is clear that the court knew the applicable law, weighed the appropriate factors, and came to a decision based solely upon the evidence presented after weighing that evidence in relation to Anthony's best interest. We cannot say that the court's decision was arbitrary, fanciful, or unreasonable, or that no reasonable person would have awarded guardianship to Sandra. Thus, the court did not abuse its discretion.

¶ 23                                    III. CONCLUSION

¶ 24 The judgment of the circuit court of DuPage County is affirmed.

¶ 25 Affirmed.